UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA,

                                No. 15-CR-342 (BKS)

        vs.

RALPH DANIEL SMITH,

                   Defendant.

-------------------------------------------------------x


## DEFENDANT'S SENTENCING MEMORANDUM


Daniel DeMaria
Merchant Law Group LLP
535 Fifth Avenue, Fl. 25
New York, New York, 10017
Tel: 212-658-1710
Fax: 212-658-1711
ddemaria@nyslitigators.com


Nicholas Passalacqua
510 Bleecker Street
Utica, New York 13501
Tel. 315-688-1268
Fax. 315-688-1266
nick@cnytriallaw.com

## PRELIMINARY STATEMENT

As a consequence of his guilty plea to production of child pornography, Ralph Smith faces a mandatory minimum sentence of 15 years in prison.  We respectfully seek the mandatory minimum sentence of 15 years.  Ultimately, 15 years is a sentence that is more than "sufficient" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).  As discussed below, Ralph understands the seriousness of the grave offense he has committed. His conduct, though serious, does not equate with the draconian prison term that is reflected by the advisory United States Sentencing Guidelines.  As  discussed more fully below, the advisory Guidelines range in  this particular case is not reflective of an appropriate sentence.

Ralph's application to be sentenced to the minimum sentence is not an  appeal only to sympathy, but also to reason, as it balances the crimes he has regrettably committed with the fact that this is his first offense and that his crime took place during a 36 day period. It also factors Ralph's unique and tragic familial circumstances, the fact that he has accepted responsibility,  the  fact  that  he  is  a  low  risk  to  reoffend  and  what  appears  to  be  an unconscionable discrepancy in amount of prison time he would have been exposed to for the same criminal conduct had he been prosecuted solely by New York state authorities as opposed to Federal authorities. For these compelling reasons, we respectfully submit that the mandatory minimum sentence of 15 years imprisonment is more than sufficient punishment for a relatively young man who, despite his flaws, nevertheless has many redeeming qualities. This  is  doubly  true  in  circumstances  where  Ralph  will  be  required  to  register  as  a  sex

offender upon his release from prison and can be placed on lifetime supervised release.

## SENTENCING GUIDELINES

According to the PSR, Ralph's total offense level is 43. His criminal history category is II (PSR ¶ 120). Thus, his guideline imprisonment range is 2880 months (240 years). Importantly, Probation recognizes that Ralph accepts responsibility for his conduct. (PSR ¶ 90).

## OBJECTIONS TO THE PSR

Ralph objects to paragraph 89 of the PSR and states that the charged conduct occurred within a span of 36 days and involved one single victim. As such, Ralph states that U.S.S.G. § 4B1.5(b)(1) does not apply and that his conduct does not constitute a pattern of activity.

## DEPARTURES

A downward departure may be warranted where "reliable information indicates that the criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. §4A1.3(b)(1). See, e.g., United States v. Shoupe, 988 F.2d 440 (3d Cir. 1993); United States v. Lacy, 99 F. Supp. 2d 108 (D. Mass. 2000); United States v. Santos, 406 F. Supp. 2d 320 (S.D. N.Y. 2005) (criminal convictions unnecessarily counted twice); United States v. Frappier, 377 F. Supp. 2d 220 (D. Me. 2005); United States v. Swan, 327 F. Supp. 2d 1068 (D. Neb. 2004).

In this case, Ralph committed the instant offense, and plead guilty to the instant offense prior to pleading guilty to related charges in state court (PSR ¶ 94). The offenses are intimately related. Had Ralph been sentenced in Federal Court prior to being sentenced in State Court, he would have been in criminal history category one, and so it is submitted that a downward departure from criminal history two to criminal history one is appropriate in this case.

## THE SENTENCE IN THE INSTANT CASE SHOULD RUN CONCURRENT WITH THE STATE SENTENCE

On May 17th, 2016, Ralph was sentenced to a six year term of imprisonment, following his plea of guilt in Herkimer County Court (PSR ¶ 94). That case constitutes relevant conduct to the instant case, and Ralph's federal sentence should run concurrent to his state sentence. Under U.S.S.G. § 5G1.3(b), if the defendant's prior sentence remains undischarged and if it resulted from conduct that is relevant conduct to the instant offense of conviction and that was the basis for an increase in the offense level for the instant offense, then the sentence for the instant offense is to be imposed to run concurrently to the undischarged term of imprisonment. As explained by the Supreme Court, U.S.S.G. § 5G1.3 attempts to achieve some coordination of sentences imposed in situations where a defendant is prosecuted in more than one jurisdiction for the same criminal course of conduct with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time, that is,

had all of the offenses been prosecuted in a single proceeding. Witte v. United States, 515 U.S. 389 (1995).

## THE FIFTEEN YEAR MANDATORY MINIMUM SENTENCE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Ralph respectfully asserts that 18 U.S.C. § 2251's fifteen-year mandatory sentence violates the Eighth Amendment's prohibition against cruel and unusual punishments because it eliminates the sentencing judge's discretion, and is grossly disproportionate as applied to his conduct given the fact that he grew up in a dysfunctional and abusive home where he witnesses his father sexually abuse a family member (PSR ¶ 98).

There have been a number of Eight Amendment challenges to mandatory minimums in child pornography cases, and appellate courts have consistently denied that these mandatory minimums violate the Eight Amendment. See, United States v. Reingold, 731 F.3d 204 (2d Cir. 2013) (five-year sentence for possession of child pornography did not violate the Eight Amendment); United States v. Martin, 2006 WL 1359945 (2d Cir. 2006) (holding that imposition of five-year mandatory minimum sentence for transmitting child pornography in interstate commerce is not unconstitutionally disproportionate to the crime committed, even considering defendant's physical disability as a paraplegic); United States v. Soule, 2007 WL 2962373 (10th Cir. 2007) (sentence above the mandatory statutory minimum of 120 months for second conviction for possession of child pornography did not violate the Eighth Amendment); United States v. Meiners, 485 F.3d 1211 (9th Cir. 2007 (per

-4-

curiam) (fifteen-year mandatory minimum sentence for advertising child pornography under § 2251(d) did not amount to cruel and unusual punishment in violation of the Eighth Amendment); United States v. Green, 2007 WL 4403148 (11th Cir. 2007) (ninety-month sentence for violations of § 2252 (a)(2) and (a)(4) does not violate Eighth Amendment); and United States v. Bledsoe, 2006 WL 1083353 (4th Cir. 2006) (mandatory minimum of fifteen years pursuant to § 2251(d) for advertising willingness to trade child pornography does not violate the Eighth Amendment).

In light of Senior Judge Weinstein's Order in United States v. D.W., 13 Cr. 173 (JBW) (EDNY) (Doc. #73 at page 4), Ralph respectfully requests that the Court render a decision as to whether or not 18 U.S.C. § 2251's fifteen-year mandatory sentence violates the Eighth Amendment's prohibition against cruel and unusual punishments in order to preserve the issue for possible appeal and post-conviction proceedings.

## SENTENCES IN CHILD PORNOGRAPHY CASES

It is not uncommon for federal judges to sentence those charged with production of child pornography to the fifteen year mandatory minimum. See, e.g., United States v. Richard Hastings, 14 Cr. 139 (GLS) (NDNY) (imposing sentence of 180 months despite guidelines range of life); United States v. Sierra Danyelle Halsey, 13 Cr. 164 (E.D. Va.) (imposing sentence of 180 months despite Guidelines range of 600 months); United States v. Nicholas William Soto, 2014 Cr. 110 (E.D. Wash.) (imposing sentence of 180 months despite guidelines range of 262 to 327 months); United States v. Shane M. Sells, 14 Cr. 248 (E.D.

Wis.) (imposing sentence of 180 months despite guidelines range of 210 to 262); United States v. Paul Henry, 14 Cr. 64 (D. Me.) (imposing sentence of 180 months); United States v. Rube, 14 Cr. 322 (W.D. Tex.) (imposing sentence of 180 months); United States v. Matthew B. Puterbaugh, 14 Cr. 200 (M.D. Pa.) (imposing sentence of 180 months); United States v. Gabriel Simmons, 10 Cr. 318 (D. Wyo.) (imposing sentence of 180 months); United States v. Johnny Ray Martinez, 2014 Cr. 15 (N.D. Tex.) (imposing sentence of 180 months); United States v. Jeremy Brendan Sears, 2014 Cr. 274 (C.D. Cal.) (imposing sentence of 180 months); United States v. Ray Carl Short, 14 Cr. 27 (D. Idaho) (imposing sentence of 180 months); United States v. Dale Wray Fulford, 14 Cr. 14 (N.D. Tex.) (imposing sentence of 180 months); United States v. Kyle Unterbrink, 14 Cr. 297 (W.D. Tex.) (imposing sentence of 180 months); United States v. Jeremy L. Wallace, 13 Cr. 285 (S.D. Ohio) (imposing sentence of 180 months); United States v. Nicholas Pinto, 8 Cr. 325 (M.D. Pa) (imposing sentence of 180 months); United States v. Gary A. McArthur, 12 Cr. 30137 (S.D. Ill.) (imposing sentence of 180 months); United States v. Derrick Gossett. 13 Cr. 604 (S.D. Tex.) (imposing sentence of 180 months); United States v. Timothy Wayne Pollock, 11 Cr. 17 (N.D. Fla.) (imposing sentence of 180 months); United States v. Mitchell Duane Porter, 11 Cr. 95 (E.D. Tx.) (imposing sentence of 180 months); United States v. Stanley Weems., 11 Cr. 71 (E.D. Tenn.) (imposing sentence of 180 months); United States v. Eric Whitson, 12 Cr. 67 (E.D. Ky.) (imposing sentence of 180 months); United States v. Robert Ririe, 10 Cr. 820 (D. Utah); and United States v. Benito Delgado Jr., 7 Cr. 245 (S.D. Tx.) (imposing

sentence of 180 months).

Production of child pornography cases in New York are seemingly rare. In other child pornography cases judges in New York often impose sentences well below the guideline range. See, e.g., <u>United States v. David Santana</u>, 08 Cr. 1112 (LAK) (imposing sentence of 24 months' incarceration despite Guidelines range of 97-120 months); <u>United States v. Ira Kemp</u>, 09 Cr. 658 (JSR) (imposing 60 months' incarceration despite Guidelines range of 210-262 months); <u>United States v. Hector Garcia</u>, 10 CR 914 (BSJ) (imposing sentence of 5 years' probation despite Guidelines range of 87-108 months); <u>United States v. Michael Jin</u>, 09 Cr. 678 (RJS) (imposing probation despite Guidelines range of 57-71 months); <u>United States v. Robert Santana</u>, 10 Cr. 341 (SHS) (imposing probation despite Guidelines range of 51-63 months); and <u>United States v. Jason Arberger</u>, (08 Cr. 894) (AKH) (imposing probation despite Guidelines range of 41-51 months).

Appellate courts have consistently upheld below-guideline sentences in child pornography cases when the facts considered pursuant to 18 U.S.C. § 3553(a) warranted such a sentence. See e.g., <u>United States v. Dorvee</u>, 616 F.3d 174 (2d Cir. 2010) (holding within Guidelines child pornography sentence procedurally and substantively unreasonable); <u>United States v. Stall</u>, 581 F.3d 276, 286, 289 (6th Cir. 2009) (upholding as substantively and procedurally reasonable a sentence of one day of incarceration and ten years of supervised despite Guidelines range of 57-71 months); <u>United States v. Duhon</u>, 541 F.3d 391, 399 (5th Cir. 2008) (upholding as substantively reasonable a sentence of 5 years probation despite

Guidelines range of 27-33 months); United States v. Rowan, 530 F.3d 379, 381 (5th Cir. 2008) (upholding sentence of 5 years probation despite Guidelines range of 46-57 months incarceration).

## A GUIDELINE SENTENCE IS
## SUBSTANTIVELY UNREASONABLE IN THIS CASE

The Supreme Court has stated that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109, 128 S.Ct. 558, 574 (2007) (quoting Rita v. United States, 551 U.S. 338, 350, 127 S.Ct. 2456, 2465 (2007)).

In Rita, the Court recognized that an appellate court may adopt "a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines." 551 U.S. at 347, 127 S.Ct. at 2462. It is submitted that USSG §2G2.1 is so flawed that a within-guideline sentence should not be presumed reasonable. In Rita, the Supreme Court explained the process used by the Sentencing Commission to ensure that the guidelines meet the sentencing purposes set forth in 18 U.S.C. §3553(a). That process begins with the "empirical approach" of using pre-guidelines PSRs to set baselines, followed by adjustments through an evolutionary process. Rita, 551 U.S. at 348-50, 127 S.Ct. at 2463-64. The evolutionary process includes considering feedback from courts in the form of departures and variances, directly consulting with various stakeholders and experts in the

criminal justice system, and taking account of "advancement in [the] knowledge of human behavior." 551 U.S. at 350, 127 S.Ct. at 2464 (quoting 28 U.S.C. § 991(b)(1)(C)). See 28 U.S.C. § 994(m) (identifying pre-guidelines sentences as the starting point); 28 U.S.C. § 994(o) (mandating that the USSC consult with criminal justice authorities).

USSG 2G2.1 is not the result of this empirical and evolutionary process. Instead, it is the product of repeated Congressional intervention in the form of directives, such as The Child Protection Restoration and Penalties Enhancement Act of 1990, Title III of the Crime Control Act of 1990, Pub.L. 101–647, 104 Stat. 4789,, which directed the USSC to "amend existing guidelines for sentences involving sexual crimes against children ... so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate." United States Sentencing Commission, The History of the Child Pornography Guidelines (Oct. 2009). This process of ad hoc intervention "routinely result[s] in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." United States v. Dorvee, 616 F.3d 174, 186 (2nd Cir. 2010).

The Government often argues that the process resulting in the creation of the guidelines reflects Congressional intent and so the guidelines should be granted deference. This echos an argument rejected by the Supreme Court in Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558 (2007). The Kimbrough Court identified two main factors that undermined the authority of the crack guideline: that it was engineered to implement Congressionally mandated minimum sentences rather than to reflect the Commission's

special empirical knowledge, and that the Commission itself had conceded the guidelines' failure to properly implement the purposes of sentencing. These same factors undermine the authority of USSG §2G2.1. This is the very reason the Defendant is able to cite so many examples where those sentenced for child pornography received sentences well below the guidelines.

By treating run-of-the-mill case as aggravated offenders sentenced under §2G2.1 receive sentences disproportionate to their culpability, which in turn causes district courts to vary from the guideline in the vast majority of cases.   In violating the norms of proportionality and fairness, § 2G2.1 violates the very reasons for the existence of sentencing guidelines.

## <u>PSYCHO-SEXUAL ANALYSIS</u>

Following his arrest, Ralph was evaluated by Dr. Jacob Hadden, an expert in the field of sexual offenders. A copy of Dr. Hadden's report and his curriculum vitae are attached hereto at **Exhibit "A"** ("Hadden Report"). Dr. Hadden is a Licensed Psychologist working in Northern New York.  He holds a license to practice psychology in both New York and Vermont (Psychologist-Doctorate).   He earned his Ph.D. in Clinical Psychology at the University of Nevada, Reno in 2004.  Dr. Hadden has experience in a range of practice settings and was employed by the NYS Office of Mental Health and the NYS Department of Corrections and Community Supervision prior to starting his full-time, private practice. Dr. Hadden offers a range of psychological services with an emphasis on forensic evaluation

and psychological assessment. Dr. Hadden has conducted forensic evaluations and testified

in courts throughout New York State. He has performed work for a diverse group of referral

sources including Mental Hygiene Legal Service, the NYS Office of the Attorney General,

Federal Probation, District Attorneys' offices, private attorneys, and social service agencies

across multiple counties.

> Dr. Hadden's Report states in pertinent part at page 16:
>
> Mr. Smith was assessed as having a risk profile similar to sexual offenders that
> pose a Low risk for sexual recidivism. This means that he has only a small
> number of characteristics that are known to be correlated with sexual
> recidivism. In Mr. Smith's case, both static and dynamic risk assessments lead
> to the same conclusion. There were no factors present in Mr. Smith's case that
> suggested a need to deviate from the findings from the structured risk
> assessments. Although it is counterintuitive to most people, incest offenders
> have been consistently found to have lower levels of sexual recidivism than
> other sexual offenders. Mr. Smith also has no known history of sexual
> offending and he does not have a history of general criminality. His one known
> victim was his post-pubescent daughter. There was no evidence of a paraphilia
> or other sexual behavior disorder. He committed his first sex offense in middle
> age, which is associated with a better prognosis than those whose sex offense
> behavior starts at an earlier age. There was some evidence of lifestyle stability
> including fairly regular employment and a long-term relationship. There was
> evidence of substance abuse, but it did not appear to play a role in his sexual
> offending.

## 18 USC § 3553(a)

Section 18 U.S.C. § 3553(a) requires a sentence that is "sufficient, but not greater than

necessary" to satisfy specific sentencing goals, including just punishment, deterrence of

future criminal conduct, protection of the public, correctional treatment, and the prevention

of unwarranted sentencing disparities. 18 U.S.C. §3553(a)(2). Section 3553(a) further directs

courts to consider the applicable Sentencing Guidelines, "the nature and circumstances of the offense," and "the history and characteristics" of the defendant.

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language overrides the advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1. These factors are precisely "the sort of characteristics a court is likely to find relevant when determining the 'history and characteristics of the defendant' as required by § 3553(a)(1)." United States v. Simon, 361 F.Supp.2d 35, 40 (EDNY 2005).

### 1. The Nature and Circumstances of the Offense and History and Characteristics of the Offender.

*(A) The Nature and Circumstances of the Offense*

Ralph is the first to admit that his offense is a very serious one. He induced BM to take and send three sexually explicit images of herself to Ralph over the internet and also had some "hands-on" conduct as well. In mitigation, the three images which Ralph coerced the

victim to produce were never distributed.[1] This is an important point. One of the primary harms that child pornography laws are intended to address is the re-victimization of children every time the images and videos are viewed. Given that the images which Ralph produced were never distributed, that harm is lessened in this case. Thus, the most serious part of his crime was not so much the production of child pornography but the sexual abuse of a minor - a crime which is typically prosecuted at the state level and which usually carries far lower sentences. See  United States v. Broxmeyer, 699 F.3d 265, 303 (2d Cir. 2012) (Jacobs, dissenting) ("A statutory maximum is appropriate only for the worst offenders. Unfortunately, we have seen such defendants. They are people who force small children to engage in sexual and sadomasochistic acts, who photograph or video the scene, and who broadcast it to the world, leaving the children with the pain of the experience and the anguish of knowing that degenerates are gloating over their abuse and humiliation"); New York v. Ferber, 458 U.S. 747, (1982) ("The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation"). See also, Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110–358, Tit. I, § 102(3), 122 Stat. 4001, 4001 ("Child pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed."); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248,

---

[1]While Ralph plead guilty to distribution, the Government has never alleged that any of the images were sent to a third party. Rather, the distribution count pertains to the fact that Ralph re-sent his victim one of the images which she sent him.

§ 501(2)(D), 120 Stat. 587, 624 ("Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse");

Additionally, the three images which Ralph caused to be produced were soft core in nature. There were no images depicting prepubescent minors, no pictures involving sex, or any images depicting sadistic or masochistic conduct. Ralph only had one victim.

*(B) The History and Characteristics of the Offender.*

Ralph is 41 years old and was born in Illion, New York. (PSR ¶ 97) He has lived his entire life in the New York area. (PSR ¶ 97) His upbringing was dysfunctional and abusive due to a complicated relationship with his alcoholic father. Ralph's father was physically abusive to his mother and himself. (PSR ¶ 97) Additionally, Ralph was aware of his father sexually abusing his younger sister when she was eight or nine years old. (PSR ¶ 98) At one point, Ralph walked in on the abuse of his younger sister and they decided to tell his mother. (PSR ¶ 98) After being confronted by their mother, Ralph's father stopped the abuse but remained in the home. (PSR ¶ 98) His father passed away in 2013. (PSR ¶ 97) Ralph maintains a strong relationship with his mother and sister, and stepfather as they are very supportive of him. (PSR ¶ 97)

Ralph is married to Jacqueline Smith, and she has been supportive of Ralph throughout his incarceration. (PSR ¶ 99) They have a ten year old son together named Hunter, and Ralph continues to have a positive relationship with his son. (PSR ¶ 100)

Additionally, Ralph has two daughters and one stepdaughter. (PSR ¶ 100) Ralph's oldest daughter is 24 years old, and his youngest daughter is 17 years old. (PSR ¶ 100) His stepdaughter is 15 years old and resides with her mother in Ilion. (PSR ¶ 100)  Ralph's stepdaughter maintains contact with him and remains supportive throughout his incarceration. (PSR ¶ 100)

Attached hereto at **Exhibit "B"** are reference letters from Ralph's family and friends. The letters bear testament to Ralph's love of family, generosity, and all of the support which is available to him during his incarceration and upon his release from prison. Ralph's family and friends consider him to be considerate, thoughtful and reliable.

### 2. The Need for the Sentence Imposed to:

*(A) Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense.*

A sentence of 15 years reflects the seriousness of the crime, promotes respect for the law, and provides punishment. No one doubts such a punishment is severe for a first-time offender. In this case, Ralph's acceptance of responsibility weighs against the need for any greater punishment. Charges involving child pornography and child molestation frequently go to trial notwithstanding overwhelming evidence because many defendants cannot admit what they have done due to the shame associated with the crime. Some pedophiles remain in denial by rationalizing their behavior on the misguided grounds that a child was "sexually provocative" or that the experience had "educational value." See United States v. Kise, 369

-15-

F.3d 766, 773 (4th Cir. 2004) (citing the DSM-IV's discussion of pedophiles).

Courts have often cited a defendant's lack of remorse as one factor warranting a severe sentence in child pornography cases. See United States v. Oehne, 698 F.3d 119 (2d Cir. 2012) (noting with approval district court's reliance on defendant's attempt to "downgrade" crime in upholding sentence); United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (citing defendant's blame of his victims rather than himself and general lack of remorse as aggravating factor warranting 30 year sentence); U.S. v. Curtis, 2013 WL 1196878, 6 (11th Cir. 2013) (upholding district court's 360 month sentence in part because defendant's "lack of remorse and blame towards the victim outweighed" the fact that he had only minor criminal history); United States v. Christie, 624 F.3d 558, 574 (3d Cir. 2010) (upholding lengthy sentence as reasonable in part because defendant expressed no remorse).

Smith by contrast, has accepted responsibility and is remorseful for his conduct. These factors should be weighed heavily in this case. By pleading guilty, Ralph spared his victims (and jurors) the trauma of a trial. At no time did he try to deny or rationalize his wrongful conduct. Upon his release from prison, Ralph will have to register as a sex offender for a lengthy period of time, if not life, which will lead to the publication of his crime to the entire community. Collateral consequences of conviction, such as sex offender registration, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., United States v. Garate, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register

-16-

as a sex offender under § 3553); <u>United States v. Pauley</u>, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct" in a child pornography case because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence").

Whatever his prison term, following his sentence Ralph will have gone from being a well-liked member of society to a registered sex offender and social pariah. Surely this is part of his punishment and lessens any need for additional incarceration solely to reflect that sentencing goal.

Moreover, the Court should take into consideration the fact that sex offenders like Ralph are often mistreated by other inmates in prison. See for example, ABC News, Prison Is 'Living Hell' for Pedophiles (Attached hereto at **Exhibit "C"**).

*(B) Afford Adequate Deterrence to Criminal Conduct*

A sentence of 15 years is widely viewed as severe and will provide general deterrence to criminal conduct. Normally sentences of such length are imposed only for repeat violent offenders. Such a sentence will surely provide sufficient specific deterrence for a defendant who has never before set foot in jail.

*(C) Protect the Public from Further Crimes of the Defendant*

Ralph's history and characteristics make him a very low risk to re-offend. According

to the Sentencing Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases", from 29.5% for offenders under age 21 (Criminal history category I), down to 6.9% for offenders age 41 to 50 at the time of sentence. See U.S. Sentencing Commission, Measuring Recidivism (May 2004) at 12 & Ex. 9 (Excerpts attached hereto at **Exhibit "D"**). Ralph will be over 50 when released even if he receives the statutory minimum.

Moreover, Ralph will be required to undergo treatment as a condition of his supervised release. In a recent report to Congress concerning child pornography, the Sentencing Commission reported that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism - some of them very significant.'" U.S. Sentencing Commission: Report to Congress - Child Pornography Offenses (December 2012) at 278 & n. 30 (Excerpts attached hereto at **Exhibit "E"**).

Additionally, the effectiveness of post-release supervision cannot be overstated. The Probation Department for the Eastern District of New York reported to Senior Judge Jack Weinstein that even though many of its child pornography supervisees had prior sexual contact with minors – "[m]uch to the credit of our supervising officers and treatment providers, we have had only 1 known offender convicted of [a] child pornography offense who committed a new sexual contact offense while under the supervision of this department, which we are aware of." (See Memorandum to the Honorable Jack B. Weinstein from Eileen Kelly, Exhibit E to Memorandum and Order (Doc. # 140-3), in United States v. C.R.,

09-CR-155 (JBW) (attached hereto and marked as **Exhibit "F"**) The demonstrated effectiveness of the Probation Department at supervising sex offenders lessens the need for a lengthy sentence for incapacitation alone.

*(D) To Provide the Defendant with Needed Training and Treatment*

Ralph is in need of sex offender treatment and substance abuse treatment. The BOP's Residential Sex Offender Treatment Program lasts 12-18 months and the minimal custodial sentence to ensure placement in the program is 27 months. See, BOP Sex Offender Program (February 15th, 2013) at 16 and 23 (Excerpts attached hereto at **Exhibit "G"**). The remainder of Ralph's treatment will take place while he is on supervised release. As detailed in the memo submitted by the Probation Department in C.R., sex offenders undergo intensive treatment including weekly group and individual sessions, as well as polygraphs. Given the brevity of the BOP's program, whatever sentence Ralph receives above 180 months will likely lessen the amount of treatment he receives.

## CONCLUSION

If the Court agrees that a sentence of 180 months is appropriate in this case, Ralph's reaction will most assuredly not be "oh I got away with one, I can do it again." To the contrary, Ralph's reaction will be overwhelming gratitude to the Court for giving him a second chance at life. Ralph most respectfully does not need a life sentence to teach him a lesson. That lesson was learned when he first met counsel who described to him his legal

-19-

situation and the potential sentence he was facing due to his conduct - a fifteen year mandatory minimum. That lesson has been entrenched in his mind never to be forgotten. The lesson will be reinforced every time he is told by a correctional officer what to do and when to do it. The constant reinforcement, coupled with sex offender and substance abuse treatment makes it unlikely that Ralph will reoffend.

Dated:      New York, New York
            June 23rd, 2016          _____
                                          Daniel DeMaria

                                     Merchant Law Group LLP
                                     535 Fifth Avenue, Fl. 25
                                     New York, New York 10017
                                     Tel: 212-658-1710
                                     Fax: 212-658-1711
                                     ddemaria@nyslitigators.com

# EXHIBIT "A"

**Jacob E. Hadden, Ph.D.**
P.O. Box 1202
Lake Placid, New York 12946
Office Phone: (518) 588-5173
Email: jake@haddenpsych.com

## PROFESSIONAL CERTIFICATIONS
New York State License:
### PSYCHOLOGIST
License Number: 016726-1

Vermont License:
### PSYCHOLOGIST – DOCTORATE
License Number: 048.0092013

## EDUCATION
*May 2004*   DOCTOR OF PHILOSOPHY in Clinical Psychology, The University of Nevada, Reno
*May 2000*   MASTER OF ARTS in Clinical Psychology, The University of Nevada, Reno
*1993-1996*  BACHELOR OF ARTS in Psychology, Furman University
             Honors: Magna Cum Laude, Psi Chi
*1992-1993*  State University of New York at Plattsburgh
             Honors: Phi Eta Sigma

## EMPLOYMENT
## CLINICAL AND ASSESSMENT EXPERIENCE
*Apr. 2011-*   *Private Practice, Licensed Psychologist*
*Present*      Administer psychological assessments related to learning, intelligence, memory, and executive functioning.  Conduct forensic evaluations and provide expert testimony for NYS courts with an emphasis on mental health, risk, parenting, and sexual offender issues. Provide psychotherapy in an outpatient setting.  Provide treatment and evaluation services to individuals on Federal Probation.  Provide evaluations and consultation services for the Clinton County Department of Social Services.

*Mar. 2009-*   *Psychiatric Examiner, NYS Office of Mental Health, Bureau of Sex*
*Apr. 2013*    *Offender Evaluation and Research*
               Conduct psychological evaluations under NYS MHL Article 10 of designated sexual offenders being released from incarceration to determine if they have a mental abnormality that predisposes them to the commission of sexual offenses, and to determine these offenders risk of re-offense. Conduct annual evaluations of sexual offenders confined in NYS OMH secure treatment facilities under NYS MHL Article 10 to determine readiness for release to Strict and Intensive Supervision and Treatment in the community.  Perform evaluations of sexual offenders who have violated the conditions of their Strict and Intensive Supervision and Treatment orders to

April 2016                                                                    1

determine if they are in need of confinement in a secure treatment facility due to increased risk for recidivism.

Apr. 2008-
Mar. 2009
*Licensed Psychologist, NYS Department of Corrections, Sexual Offender Counseling and Treatment Program, Clinton Correctional Facility*
Provide clinical oversight for 41-bed sexual offender treatment unit for moderate and high risk offenders. Administer psychosexual evaluations and risk assessments to sexual offenders. Supervise treatment planning and service delivery. Conduct therapy groups. Manage sexual offender records. Coordinate with other agencies involved in sex offender management. Instrumental in rewriting statewide treatment manual for DOCS sex offender programs as part of Central Office workgroup. Provide training to staff on best treatment practices. Consult with programs in other facilities to improve service delivery.

Nov. 2007-
Mar. 2008
*Psychologist II, Office of Children and Family Services, Adirondack Residential Center*
Supervise and deliver behavioral health care in 25-bed juvenile detention Facility for juvenile offenders. Provide individual and group psychotherapy to adjudicated adolescents with a range of clinical problems. Administer assessment instruments and conduct intake interviews. Coordinate treatment planning. Consult with direct care staff in managing behavioral and mental health issues. Provide crisis management services. Deliver staff training in restraint-free behavior management techniques.

June 2006-
Nov. 2007
*Lead Psychologist, Psychologist II, NYS Department of Corrections, Merle Cooper Program, Clinton Correctional Facility*
Supervised delivery of therapeutic services in 216-bed criminal rehabilitation program treating a range of offender types, including sexual offenders. Provided day-to-day management of therapeutic community running on 3 housing units in maximum-security prison. Provided frontline clinical supervision of service providers. Prepared treatment and discharge evaluations. Delivered group therapy. Screened inmates for admission into program. Participated in treatment planning. Provided brief individual interventions. Supervised psychology interns.

Sept. 2005-
June 2006
*Psychologist I, NYS Department of Corrections, Merle Cooper Program, Clinton Correctional Facility*
Directed management of therapeutic community in 92-bed housing unit in a maximum-security prison. Delivered group therapy. Provided individual interventions for mental health and behavioral issues. Conducted intake interviews. Prepared treatment and discharge evaluations. Participated in treatment planning and assessment.

Nov. 2004-
Sept. 2005
*Postdoctoral Intern, Student Health and Psychological Services Center, Present Plattsburgh State University*

April 2016                                                                2

Provided short-term individual, group and couples psychotherapy to students. Conducted intake interviews and provided triage and referral services. Provided emergency and after-hour on-call coverage for students. Provided specialized outreach and treatment for issues related to domestic violence and sexual assault in conjunction with the Office of Violence Prevention. Participated in a range of prevention and outreach activities on campus, including prevention of domestic violence and sexual assault, substance abuse issues, and hazing. Worked as part of multidisciplinary team to deliver coordinated psychological treatment and behavioral healthcare.

| | |
|---|---|
| *Apr. 2004-*<br>*Nov. 2004* | *Behavioral Health Officer, Captain, U.S. Army Medical Service Corps,*<br>*Active Duty, USA MEDDAC - Ft. Belvoir*<br>Provided brief individual, group, and couples psychotherapy to active duty soldiers, officers, and retired military personnel. Provided a wide variety of assessment services, including fitness-for-duty evaluations, background checks, and competency evaluations. Provided emergency on-call services in large metropolitan area and provided after-hour mental health crisis services at the Ft. Belvoir Emergency Room. Worked as part of multidisciplinary team and regularly provided consultation to clinicians in other disciplines. Discharge: Honorable |
| *Sept. 2003-*<br>*Jan. 2004* | *Staff Psychologist, Northeast Kingdom Human Services*<br>Provided brief psychotherapy to children, adolescents, and adults, Conducted intake interviews and assessments, Performed comprehensive psychological assessments, Coordinated with members of a multi-disciplinary team, Provided emergency services and consultation with local hospital. |
| *Aug. 2002-*<br>*Aug. 2003* | *Clinical Psychology Intern, Counseling and Psychological Services*<br>*Center, Norwich University*<br>Provided individual psychotherapy for students and staff, Conducted intake interviews and assessments, Conducted comprehensive learning and psychological assessments, Participated in case conferences with professional staff, Provided consultation and outreach for other departments on campus, Provided coverage for after-hours emergency services. |
| *July 1999-*<br>*July 2002* | *Therapist, The Counseling and Testing Center, University of Nevada,*<br>*Reno*<br>Provided individual and couples therapy for traditional and non-traditional students, Received intensive training in brief therapy model, Conducted intake interviews and assessments, Participated in case conferences with other professional staff, Provided community outreach services. |
| *April 2001-*<br>*Feb. 2002* | *Behavioral Medicine/psychological services, Integrated Healthcare*<br>*Resources* |

April 2016                                                                                                    3

Provided psychotherapy for chronic pain patients, Worked with medical professionals to coordinate care for chronic pain patients, Conducted presurgical screening and assessment for chronic pain patients, Participated in case conferences with professional staff, patients, and insurance company representatives.

*Aug. 1998-*
*July 1999*

*Program Coordinator, Alzheimer's Association, Northern Nevada Chapter*
Facilitated support groups for individuals with early-stage Alzheimer's disease, Facilitated support groups for caregivers of dementia patients, Provided support and consultation on the Chapter Helpline, Conducted one-on-one consultation with families and professionals.

*Sept.1996-*
*July 1999*

*Therapist, Psychological Services Center*
Conducted individual psychotherapy with adults and elderly adults, Trained in Acceptance and Commitment Therapy and Empirically-Supported Treatments, Experienced in psychological assessment and treatment planning, Conducted Neuropsychological Assessments, Provided consultation for the management of problem behaviors

## RESEARCH EXPERIENCE

*1996-1998*

*Research Assistant, Clinical Gerontology Laboratory*
Trained nursing home staff in dementia care, Provided consultation on care planning, Trained and supervised other employees, Supervised data collection and management, Analyzed results of grant project for dissemination to the field.

## TEACHING EXPERIENCE

*2000 Summer*

*Instructor, The University of Nevada, Reno*
Taught Psychology 451: Basic Principles of Psychotherapy

*2001 Spring*

*Instructor, The University of Nevada, Reno*
Taught Psychology 441: Abnormal Psychology

## OTHER PRESENTATIONS & PUBLICATIONS

Fisher, J.E., Harsin, C.M., & Hadden, J.E. (1997). Direct Observation and Staff Ratings of Behavioral Disturbances in Dementia Patients in Long-Term Care. Poster presented at the Annual Meeting of the Gerontological Society of America, November 1997, Cincinnati, OH.

Fisher, J.E., Hadden, J.E., & Harsin, C.M. (1997). Environmental Context of Behavioral Disturbance in Alzheimer's Disease. Poster presented at the Annual Meeting of the Gerontological Society of America, November 1997, Cincinnati, OH.

Hadden, J.E. & Fisher, J.E. (1998). Behavioral Disturbances as Alternative Forms of Communication. Paper presented at the Annual Convention of the Association for the Advancement of Behavior Therapy, November 1998, Washington, D.C.

Fisher, J.E., Hadden, J.E., & Buchanan, J.A. (1998). The Functions of Agitation in Dementia Patients. Poster presented at the Annual Convention of the Association for the Advancement of Behavior Therapy, November 1998, Washington D.C.

Hadden, J.E., Fisher, J.E., Buchanan, J.A., Fredericks, D., & Porter, J. (1999). The Assessment of Reinforcer Preferences in Dementia Patients. Poster presented at The Annual Meeting of the Gerontological Society of America, November 1999, San Francisco, CA.

Hadden, J.E., Fisher, J.E., Buchanan, J.A., Fredericks, D., & Porter, J. (1999). Assessing the Functions of Problem Behavior in Dementia Patients. Paper presented at The Annual Meeting of the Gerontological Society of America, November 1999, San Francisco, CA.

Fisher, J.E., Harsin, C.M., & Hadden, J.E. (2000). Behavioral interventions for dementia patients in long-term care settings. Directions in Clinical and Counseling Psychology.

Fisher, J.E., Harsin, C.W., & Hadden, J.E. (2000). Behavioral interventions for patients with dementia. In V. Molinari (Ed.), Professional Psychology in Long-term Care. Hatherleigh Company: Long Island City, NY.

Fisher, J.E., Buchanan, J.A., & Hadden, J.E. (2001). Clinical psychology curriculum and the industrialization of behavioral healthcare. In N.A. Cummings, B.T. O'Donohue, S.C. Hayes, & V.M. Follette (Eds.), Integrated behavioral healthcare: Positioning mental health practice with medical/surgical practice. Academic Press: San Diego, CA.

## OTHER TRAINING

| | |
|---|---|
| *1994-1996* | *U.S. Army ROTC*<br>Commissioned 1996 |
| *1995* | *Graduate - Air Assault School, Ft. Rucker, Alabama* |
| *1993* | *Graduate - Marine Platoon Leader's Class (OCS), Quantico, VA* |

## PROFESSIONAL AFFILIATIONS
- o   American Psychological Association
- o   Association for the Treatment of Sexual Abusers
- o   NYS Association for the Treatment of Sexual Abusers
- o   American Psychology - Law Society
- o   American Professional Society on the Abuse of Children

| Sexual Offender-Specific, Mental Health, and Risk Assessment Trainings | |
|---|---|
| 01/27/2016 | FASD and the Criminal Justice System: A Review for Forensic Professionals by Jerrod Brown, M.A., M.S. |
| 12/09/2015 | Cognitive Assessment in Aging by Anne-Marie Kimbell, Ph.D. |
| 10/16/2015 | Using Neuroscience to Assess Sexual Arousal and Deviancy by Christian Joyal, Ph.D., Sarah Jones, Ph.D., and Christian Kargel, Dipl.Psy. |
| 10/16/2015 | Methodology Matters: Critical Thinking and Advanced Research Methods by Kevin Nunes, Ph.D., Patrick Lussier, Ph.D., Franklyn Graham, M.S., and Raymond Knight, Ph.D. |
| 10/16/2015 | Conducting "Sexual Abuser Risk of Harm to Children Assessments" using the ROSAC by Robert McGrath, M.A. and Georgia Cummings, B.S. |
| 10/15/2015 | Neurochemistry and Treatment of Deviant Sexual Interests and Offending by Gillian Tenbergen, M.Sci., Jeffrey Abracen, Ph.D., and Alessandra Gallo, M.A. |
| 10/15/2015 | Understanding and Treating Hypersexuality Disorder by Drew Kingston, Ph.D., Raymond Knight, Ph.D., and Liam Marshall, Ph.D. |
| 10/15/2015 | Rare Paraphilias by Brian Holoyda, M.D. & Andrew Brankley, M.A. |
| 10/15/2015 | From Sweeping Controversies Toward a Differentiated View on the Effects of Sexual Offender Treatment by Friedrich Losel, D.Phil. |
| 10/14/2015 | Connecting Theory with Research: How to Test the Theoretical Assertions about the causes of Sexual Offending by Kevin Nunes, Ph.D., Chantal Hermann, M.A., Michael Seto, Ph.D., Anthony Beech, D.Phil., and Patrick Lussier, Ph.D. |
| 03/01/2015 - 05/14/2015 | 10-week training on the Best Practices in the Evaluation of Competence to Stand Trial by Patricia Zapf, Ph.D. |
| 05/11/2015 | 40 Clinical Judgment Biases in Forensic Assessment by Jay Singh, Ph.D. |
| 05/08/2015 | Hypersexuality: Why is it Still Relevant? by Ronald Field, Ph.D. |

| | |
|---|---|
| 05/08/2015 | Current Issues in the Assessment of Risk of Sexual Offending Behaviors by Erik Schlosser, Ph.D. |
| 05/07/2015 | Community Supervision of High Risk Offenders: New Problems, New Solutions by panel involved in the running of Strict and Intensive Supervision and Treatment in NYS. |
| 05/07/2015 | Past, Present, and Future of Civil Confinement by panel of experts |
| 05/19/14 | Clearly and Accurately Communicating Risk Information by R. Karl Hanson, Ph.D. |
| 06/12/13 | SCL-90-R and BSI Tests: The Derogatis Checklist Series by Leonard Derogatis, Ph.D. |
| 06/06/13 | Keys in Completing Competent Parenting Evaluations by Andrew Benjamin, JD, Ph.D. |
| 05/22/13 | Deviant Sexual Interests: Their Importance and their Modification by William Marshall, Ph.D. |
| 05/21/13 | What's new with PPG: The Current State of PPG Research by Peter Byrne, Ph.D. |
| 05/21/13 | Assessment of Juvenile Offenders by Linda Rassmussen, Ph.D. |
| 05/20/13 | Assessing Risk, Readiness, and Change with the Violence Risk Scale – Sexual Offender Version (VRS-SO) by Mark Olver, Ph.D. |
| 05/14/13 | Using New Technology in the Abel  Assessment of Sexual Interests Tests |
| 05/07/13 | MMPI-2-RF – Overview by Yossef Ben-Porath |
| 04/17/13 | Best Practices in Forensic Mental Health Assessment: Evaluation of Parenting Capacity in Child Protection |

April 2016                                                                 7

| | |
|---|---|
| 02/08/13 | DSM-5: Controversies, Changes, and Clinical Implications by Jerome Wakefield, Ph.D. |
| 09/25/12 | Deception NOS: The Polygraph during Civil Commitment by Ken Blackstone |
| 05/23/12 | Intellectual Disability and Problems in Sexual Behavior: Assessment, Treatment, & Promotion of Healthy Sexuality by Robin Wilson, Ph.D. |
| 05/22/12 | Forensic Implications of the DSM-5 by Richard Krueger, M.D. and Michael First, Ph.D. |
| 05/22/12 | The Psychopharmacological Treatment of Paraphilias and Hypersexual Disorder by Richard Krueger, M.D. and Grace Lee, M.D. |
| 05/21/12 | The Current State of Assessing and Treating Adolescents who have Sexually Abused, Full Day Training by David Prescott, LICSW |
| 03/20/12 – 03/21/12 | Static-99R, Stable-2007, Acute-2007 and Case Conceptualization Training by Robin Wilson, Ph.D. |
| 11/04/11 | Severe Sexual Sadism by S. Hucker, M.D., M. Osterheider, M.D., A. Mokros, Ph.D., & J. Nitschke, M.D. |
| 11/04/11 | Inter-Rated Reliability and Prevalence of Proposed DSM-5 Paraphilia Diagnoses by R. Wilson, Ph.D., D. Thorton, Ph.D., D. Orazio, Ph.D. |
| 11/04/11 | Brain Research and Pedophilia: What it Means for Assessment, Treatment, and Policy and The Science and Practice of Positive Psychology – ATSA Plenary Lectures |
| 11/03/11 | Hypersexuality and Hypersexuality Disorder: Diagnostic and Clinical Implications by M. Kafka, M.D., D. Kingston, Ph.D., and L. Marshall, Ph.D. |
| 11/03/11 | Sex Offender Treatment Outcome and the Aging Sex Offender in Canadian Corrections by T. Nicholaichuk, Ph.D., M. Olver, Ph.D., and S. Wong, Ph.D. |
| 11/03/11 | Milestones in Sex Offender Research and Treatment and Juveniles who Sexually Offend: Research, Treatment, and Policy Milestones – ATSA Plenary Lectures. |

| | |
|---|---|
| 10/05/11 | STABLE-2007 & ACUTE-2007 Full day workshop by Robin Wilson, Ph.D. |
| 06/02/11 | Scoring of the STABLE-2007 and ACUTE-2007<br>Half day workshop presented by Dr. Wisniewski and Dr. Colistra |
| 05/25/11 | Use of the Abel for Adolescent and Adult Offenders: Evaluation, Treatment, and Management by Gavriel Fagin, MA, LMSW |
| 05/24/11 | Comparison of the Family Systems of Adolescent Sex Offenders and Non-Sexual Delinquents and Safety Planning as a Tool for Sexual Offenders |
| 05/23/11 | Assessment, Treatment, and Management of Child Pornography Offenders by Michael Seto, Ph.D. – Full day seminar |
| 11/18/10 | Sex Offenders in a Digital World & Deception Detection by Dr. James Tanner – Full day seminar |
| 05/03/10 | Assessing and Treating Sex Offenders presented by Dr. Anna Salter – Full day conference |
| 03/23/10 – 03/24/10 | Psychopathy Checklist – Revised Scoring Workshop offered by Joel Lord, Ph.D. |
| 10/06/09 | NYS Probation: Sex Offender Management Initiatives and Practice by Laura Zeliger and Gary Govel |
| 07/17/09 | Treatment Intervention and Progress Scale for Sexual Abusers with Intellectual Disabilities (TIPS-ID) Full day workshop with Robert McGrath, M.A. |
| 06/29/09 – 06/30/09 | NYS Civil Management Training: Parts I, II, & III (Training video of multiday workshop from 11.19.07 – 11.21.07) Presented by Dennis Doren Ph.D. and Thomas Fallon, J.D. |
| 06/22/09 | Psychopathy Checklist Revised (PCL-R) Workshop presented by Joel Lord, Ph.D. |
| 06/10/09 | Vermont Treatment Needs and Progress Scale (TPS) full day workshop presented by Robert McGrath, M.A. |
| 06/11/09 | NYSATSA Conference |

| | |
|---|---|
| 05/19/09 | Sex Offender Program Training: Parts I and II (Training video of full day workshop from 03.11.08)  Presented by Anna Salter, Ph.D. |
| 05/18/09 | Deception and Manipulation by Sex Offenders (Training video of seminar from 03.13.08) |
| 05/13/09 – 05/14/09 | Evaluation and Assessment (of sexual offenders): Parts I, II, & III (Training video of multiday workshop originally from 11.01.06 - 11.02.06) Presented by Dennis Doren, Ph.D. |
| 05/08/09 | Penile Plethysmography Seminar presented by Christopher Kunkle, Ph.D. |
| 04/21/09 | OMH SOTP and antiandrogen treatments full day seminar presented by Christine Rackley, Ph.D., Richard Krueger, M.D., & Li-Wen Grace Lee, M.D. |
| 08/01/08 | Developments in Sex Offender Risk Assessment: Practical Applications in Community and Institutional Settings full day seminar presented by Karl Hanson, Ph.D. & David Thorton, Ph.D. |
| 06/05/08 | Developing Effective Strategies in your Community: Sex Offender Management workshop presented by Robert McGrath, M.A. |

| Presentations and Projects in Field of Sex Offender Treatment and Evaluation | |
|---|---|
| 06/08 – 03/09 | Member of Sex Offender Counseling and Treatment Program (SOCTP) Workgroup tasked with overhauling NYS DOCS sex offender treatment program |
| 9/08 | Conducted Seminar on The Good Lives Model and Motivational Interviewing with Sexual Offenders |
| 1/09 | Consultation with Shawangunk Correctional Facility on Effective implementation Sexual Offender Treatment Program in a Correctional Facility |
| 04/10/09 | Conducted Seminar on Sexual Offender Treatment and Evaluation in the Department of Corrections for Moderate to High Risk Offenders |
| 02/10/12 | Sexual Offender Treatment: Best Practices in 2012 – Half-day professional development training delivered to the Clinton County Department of Social Services |
| 06/21/12 | Sexual Offender Treatment: Best Practices in 2012 – Half-day professional development training delivered to the Clinton County Department of Social Services |

**PSYCHO-SEXUAL EVALUATION
FILED UNDER SEAL**

# EXHIBIT "B"

## REFERENCE LETTERS
## FILED UNDER SEAL

# EXHIBIT "C"

# Prison Is 'Living Hell' for Pedophiles

**By MICHAEL S. JAMES**
Aug. 26, 2003

In prison, fellow inmates derisively call pedophiles "chesters," "tree jumpers" and "short eyes."

Prison can be a menacing place for child molesters like the former Roman Catholic priest John Geoghan, who was killed in his cell Saturday — or for other alleged pedophile priests working their way through the criminal justice system.

"If you take out a sex offender like this former priest in Massachusetts, maybe the person who took him out thought he'd make a name of himself," said Margot Bach, a spokeswoman for California Department of Corrections. "Taking [a pedophile] out would gain [the killer] a lot more respect among the other inmates."

In fact, Goeghan's accused killer, Joseph Druce, "looked upon Father Geoghan as a prize," and plotted his killing for a month, John Conte, district attorney for Worcester County, Mass., told reporters Monday.

Though prison officials in some Northeastern states question the idea of an automatic social hierarchy among prisoners based solely upon their offenses, most agree that if there is one, child molesters and informants — derided as "snitches" — occupy the lowest rungs.

### 'They Usually Don't Make It'

Such offenders, including Geoghan, often are placed into protective custody with other prisoners seen to be under a threat.

"Once their crime has become known, they usually don't make it" without protective custody, said Lt. Ken Lewis, a corrections officer and spokesman at California's Los Angeles County State Prison. "There's a lot of [pedophiles] that can successfully make it … as long as they don't brag about their offense."

If they do talk, "they'll get beat up," Lewis added. "In some places he may even get his throat cut."

That potentially could mean a lot of inmates at risk. At the end of 2001, about 83,000 state prison inmates, or about 6.8 percent, were male sex offenders who had committed a rape or sexual assault against a minor under age 18, according to Allen Beck, chief of corrections statistics for the federal Bureau of Justice Statistics.

Just 56 state and federal prisoners out of a population of about 1.3 million were actually killed by other

inmates during the yearlong period between July 1999 and June 2000, and it was unknown how many were pedophiles, Beck said.

But unpopular prisoners also can be harassed in other ways.

"[Child sex offenders] are at risk of being murdered, having their food taken, having their cells defecated and urinated in," said Leslie Walker, a prisoner's rights activist with the Massachusetts Correctional Legal Society. "Their life is truly a living hell."

## 'Who's Running This' Prison?

Part of the reason pedophiles can be so reviled is that some inmates are parents, and many were themselves sexually abused as children, some say. Druce's father told The Boston Herald that Druce frequently had been molested.

Some reports have described Druce, 37, as a member of the neo-Nazihate group Aryan Nation. In particular, Druce — who is serving a life sentence for killing a gay man who picked him up as a hitchhiker in 1988 — "has a long-standing phobia, it appears, towards homosexuals of any kind," Conte said.

With such a background, critics — including Walker and Kazi Toure, an ex-convict and prisoner support worker who still visits Massachusetts prisons — are asking how Druce could have been placed in protective custody so near to the frail, 68-year-old Geoghan at the maximum-security Souza-Baranowski Correctional Center in Shirley, Mass.

Walker cited "a culture of looking the other way in prison." Toure, co-director of the American Friends Service Committee's Criminal Justice Program in Cambridge, Mass., said he, too, was suspicious.

"For this guy who is in prison for killing a gay person … he's seeing Geoghan every day, so this stuff has got to be coming up inside of him," Toure said. "We're spending all this money [on high-tech prisons], and the guy got killed, and they want to blame it on the crazy guy? Who's running this?"

Michael Shively, a former Massachusetts corrections official, said even though Geoghan was in protective custody, it was impossible to completely guarantee his safety given that the other inmates who require protection are drawn from a difficult and dangerous population.

"To put together a group of people where it looks like no offender is a threat to another offender is almost impossible when you're drawing from that pool," Shively said.

## Local Variations

The pool of prisoners in protective custody can vary from state to state, and does not automatically include all child molesters and informants, officials and aid workers said.

California prison officials described a good deal of racial and gang affiliation among that state's prison population and a crime-based hierarchy among inmates — with certain murderers at the top of the heap.

Ironically, they said killing someone either at the top or the bottom of the totem pole will garner respect for the killer among fellow inmates — so child molesters and high-profile killers both tend to be given protective custody unless they're deemed tough or discreet enough to get along in the general population.

But things are different in other parts of the country, said Ed Ramsey, a spokesman for the Connecticut Department of Corrections, and a former corrections officer at a maximum-security prison in the state.

Ramsey does not see a clearly defined "hierarchy of crimes" among Connecticut inmates, nor large amounts of self-segregation along gang and racial lines. Therefore, he said, the state evaluates candidates for protective custody on a case-by-case basis — considering those who legitimately feel endangered, or who the institution sees as potential targets and therefore threats to maintaining order. Such targets might include inmates in high-profile cases or jailed former law enforcement officers.

In a further effort to maintain order, Connecticut officials do segregate suspected members of certain gangs, including the Aryan Brotherhood, within the prison system, Ramsey said.

Toure said although Massachusetts inmates may mock or scorn pedophiles, he does not see a strict hierarchy of crimes in the state's prisons that would lead to violence.

"I left Walpole [a maximum-security prison in Massachusetts] in '87 and there wasn't a P.C. [protective custody] unit anymore … because that stuff wasn't happening anymore, because people weren't killing other people because of sex offenders or anything like that," he said. "It had died down."

But Toure said hate can fuel violence if it festers, and as prison services for inmates are cut due to budget constraints, inmates with personal issues can lash out at others who personify their problems. He said the Geoghan killing might be a case in point.

"They don't give [Druce] any counseling or any programs to help him deal with any problems that brought him in prison," Toure claimed. "Then, they put him in protective custody … with John Geoghan, who's in jail for child molestation."

*ABCNEWS' Dan Harris contributed to this report.*

EXHIBIT "D"



RESEARCH SERIES ON THE RECIDIVISM OF
FEDERAL GUIDELINE OFFENDERS

RELEASE 1

# MEASURING RECIDIVISM:
# THE CRIMINAL HISTORY COMPUTATION
# OF THE FEDERAL SENTENCING GUIDELINES

A COMPONENT OF THE
FIFTEEN YEAR REPORT
ON THE U.S. SENTENCING COMMISSION'S
LEGISLATIVE MANDATE



May 2004

### 2. Age at Sentence

Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. Exhibit 9 illustrates the age recidivism trend of the study sample. Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent.

### 3. Race and Ethnicity

Exhibit 9 illustrates that the race of the offender is associated with recidivism rates. Overall, Black offenders are more likely to recidivate (32.8%) than are Hispanic offenders (24.3%). White offenders are the least likely to recidivate (16.0%).

### 4. Employment Status

Exhibit 10 shows that those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%). The difference between the employed and unemployed recidivating declines in the higher CHCs, until offenders in CHC VI have virtually the same recidivism rate regardless of their employment status in the year prior to their instant offense.

### 5. Educational Attainment

Exhibit 10 shows recidivism rates for offenders with different educational backgrounds. Overall, offenders with less than a high school education are most likely to recidivate (31.4%), followed by offenders with a high school education (19.3%), offenders with some college education (18.0%), and offenders with college degrees (8.8%). One exception is seen in CHC V where recidivism rates for offenders with a college education (73.3%) are higher than rates for offenders with less than a high school education (50.6%).

### 6. Marital Status

Offenders who have never been married are most likely to recidivate (32.3%), as shown in Exhibit 10. Those who are married are slightly less likely to recidivate (13.8%) than are those who are divorced (19.5%).

Exhibit 9
**Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category**
**Gender, Age at Sentencing, and Race**
Recidivism Study 2003

**CRIMINAL HISTORY CATEGORIES**

| Demographic Characteristics | Total Percent Recidivating | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
|---|---|---|---|---|---|---|---|
| **TOTAL[2]** | **24,335** | **15,429** | **2,857** | **2,844** | **1,359** | **779** | **1,067** |
| **Gender** | | | | | | | |
| Female | 13.7 | 10.0 | 23.6 | 30.7 | 40.0 | 36.8 | 39.0 |
| Male | 24.3 | 15.2 | 24.1 | 34.7 | 45.0 | 52.8 | 56.3 |
| **Age at Sentence** | | | | | | | |
| Under 21 | 35.5 | 29.5 | 35.6 | 54.7 | 64.3 | 60.1 | 55.0 |
| 21 – 25 | 31.9 | 22.3 | 29.1 | 42.7 | 55.1 | 70.1 | 68.1 |
| 26 – 30 | 23.7 | 13.3 | 27.3 | 33.6 | 43.9 | 53.1 | 58.8 |
| 31 – 35 | 23.8 | 14.6 | 22.7 | 32.7 | 42.7 | 50.8 | 59.3 |
| 36 to 40 | 19.7 | 12.1 | 23.2 | 29.4 | 33.1 | 40.0 | 51.3 |
| 41 to 50 | 12.7 | 6.9 | 13.3 | 24.5 | 45.3 | 35.7 | 41.3 |
| Over 50 | 9.5 | 6.2 | 13.9 | 19.8 | 21.0 | 57.1 | 41.1 |
| **Race** | | | | | | | |
| White | 16.0 | 8.9 | 18.9 | 27.8 | 42.8 | 46.8 | 50.9 |
| Hispanic | 24.3 | 18.9 | 22.9 | 36.0 | 28.1 | 47.0 | 57.8 |
| Black | 32.8 | 23.7 | 31.4 | 41.6 | 48.0 | 55.6 | 60.7 |
| Other[3] | 26.4 | 15.5 | 35.9 | 58.3 | 39.6 | *100.0‡* | 57.1 |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.

[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation–only sentences) or release from confinement (for those offenders receiving confinement sentences).

[3] "Other" race category includes Native Americans and Asians.

‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.

SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.

# EXHIBIT "E"

# FEDERAL CHILD PORNOGRAPHY OFFENSES



**Patti B. Saris**
*Chair*

**William B. Carr, Jr.**
*Vice Chair*

**Ketanji B. Jackson**
*Vice Chair*

**Ricardo H. Hinojosa**
*Commissioner*

**Beryl A. Howell**
*Commissioner*

**Dabney L. Friedrich**
*Commissioner*

**Jonathan J. Wroblewski**
*Commissioner, Ex-officio*

**Isaac Fulwood, Jr.**
*Commissioner, Ex-officio*

Sentencing data suggest that judges who impose lifetime terms of supervision in non-production cases do so in part in response to an offender's history of criminal sexually dangerous behavior ("CSDB").[26]  Fiscal year 2010 non-production cases in which offenders received a lifetime term of supervision had a significantly higher rate of CSDB than cases in which offenders received less than lifetime terms (48.1% compared to 28.4%), as shown in Figure 10–3 below.



**Figure 10-3**
**Non-Production Offense Characteristics:**
**CSDB by Lifetime and Non-Lifetime Supervision**
**Fiscal Year 2010**

Lifetime supervision          Non-lifetime supervision

SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10.  Of the 590 cases, twenty-four cases excluded in which a prison term was not ordered.

B.    EVALUATION AND TREATMENT OF CHILD PORNOGRAPHY OFFENDERS' SEXUAL DISORDERS

Psycho-sexual treatment is a recommended condition of supervision for all child pornography offenders.[27]  Many offenders also receive treatment in federal prison before being released on supervision.  This section first describes the psychological evaluation and treatment of child pornography offenders.  It next specifically addresses the closely related topic of risk assessment of offenders.

---

[26]  Criminal sexually dangerous behavior is discussed in Chapter 7.

[27]  *See* USSG §5D1.3(d)(7)(A) (special condition of supervised release for sex offenders, including all child pornography offenders, requires "the defendant to participate in a program . . . for the treatment and monitoring of sex offenders").

1.    *Treatment Generally*

According to many experts, the typical sex offender who presents with a sexual disorder, including pedophilia, cannot be "cured" (*i.e.*, his psychiatric disorder cannot be entirely eradicated).[28]  However, according to the Center for Sex Offender Management ("CSOM"), a project funded by the United States Department of Justice, Office of Justice Programs,[29] some recent studies show that appropriate "treatment interventions . . . are associated with lower rates of recidivism — some of them very significant."[30]  For that reason, "treatment is an essential component of a comprehensive sex offender management system."[31]

Experts disagree about how to measure the effectiveness of treatment programs.  Debates have ensued about such issues as the metric used (recidivism versus changes in sexually deviant beliefs), the proper sample size, whether treatment alone (as opposed to treatment in conjunction

---

[28]  *See, e.g.*, William Marshall, *Appraising Treatment Outcomes with Sexual Offenders*, in SEXUAL OFFENDER TREATMENT 268 (W. Marshall et al., eds., 2006) (stating that sex offender "treatment [can] reduce, but unfortunately not eliminate, the number of future victims"); Belinda Brooks-Gordon, *Psychological Interventions for Treatment of Adult Sex Offenders:  Treatment Can Reduce Reoffending Rates but Does not Provide a Cure*, 333 BMJ [formerly known as BRITISH MEDICAL JOURNAL] 5 (2006); U.S. DEP'T. OF JUSTICE, NAT'L INSTITUTE OF CORRECTIONS, QUESTIONS AND ANSWERS ON ISSUES RELATED TO THE INCARCERATED MALE SEX OFFENDER 5–6 (Oct. 1988), (available at http://static.nicic.gov/Library/007404.pdf) (stating that "[s]ex offenders are not cured" but noting that "[s]ome, but not all, sex offenders can be treated successfully").  One possible exception to the general rule that sexual disorders cannot be cured involves rare offenders whose sexual disorders are related to a physical abnormality in their brains that can be permanently altered through medical treatment.  These rare offenders do appear capable of being "cured." *See, e.g.*, David Eagleton (a professor of neuroscience at Baylor College of Medicine), *The Brain on Trial*, THE ATLANTIC (July 2011) (recounting the case of a man who, at the age of 40, first began to collect child pornography and engage in child molestation but who permanently discontinued such sexual deviancy after surgical removal of "massive tumor in his orbitofrontal cortex").

[29]  The CSOM is a federally-funded private entity jointly created in 1996 by DOJ's Office of Justice Programs, the National Institute of Corrections, and the State Justice Institute.  Its mission includes providing "useful, current, and accessible information" to government officials and private treatment providers who manage sex offenders. *See* "About CSOM," http://www.csom.org/about/about.html (last visited Oct. 26, 2012).

[30]  CSOM, *Sex Offender Treatment in the Context of Supervision:  Effectiveness of Sex Offender Treatment ("Review of the Research")*, http://www.csom.org/train/supervision/long/04_02_02.html (last visited Oct. 26, 2012) (discussing several studies of the effectiveness of treatment of sex offenders); *see also* U.K. MINISTRY OF JUSTICE NAT'L OFFENDER MANAGEMENT SERVICE, WHAT WORKS WITH SEX OFFENDERS? 1 (2010) ("Large-scale research indicates that sex offenders who receive treatment, in both prison and community settings, have a lower sexual reconviction rate than those who do not receive treatment."); R. Karl Hanson et al., *The Principles of Effective Correctional Treatment Also Apply to Sexual Offenders:  A Meta-Analysis*, 36 CRIM. JUST. & BEHAV. 865 (2009) (meta-analysis of studies on the efficacy of sex offender treatment programs; finding that the unweighted mean recidivism rate for the treatment group was almost half of that for sex offenders not treated); PEGGY HEIL & KIM ENGLISH, CAL. DEP'T OF CORR. AND REHAB., PRISON SEX OFFENDER TREATMENT: RECOMMENDATIONS FOR PROGRAM IMPLEMENTATION 1 (2007) ("While the efficacy of sex offender treatment remains a debated topic, many studies show that treatment participation is correlated with lower officially recorded recidivism rates.") (citing numerous recidivism studies).  Some experts believe that sex offenders who are psychopaths will not respond favorably to treatment. *See, e.g.*, Michael Seto & H.E. Barbaree, *Psychopathy, Treatment Behavior, and Sexual Offender Recidivism*, 14 J. INTERPERSONAL VIOLENCE 1235 (1999).

[31]  CSOM, *The Comprehensive Approach to Sex Offender Management*, at 5 (Nov. 2008), http://www.csom.org/pubs/Comp_Approach_Brief.pdf (last visited Oct. 26, 2012).

with other factors) reduces recidivism, and what conclusions may be drawn given the low base rate of *known* — versus actual — recidivism generally.[32]

Treatment of sex offenders, including child pornography offenders, has several goals. The larger goal is preventing recidivism, including sexual recidivism (*i.e.*, the commission of a new sex offense, including a new child pornography offense). Subsidiary treatment goals include addressing criminogenic needs, reducing or eliminating distorted beliefs about sexuality, fostering acceptance of responsibility by offenders, and developing empathy for victims.[33] Experts in the field agree that effective treatment requires individualized assessment and treatment.[34]

Generally speaking, the prevailing mode of treatment for child pornography offenders does not appear to differ significantly from the treatment of other types of sex offenders, including offenders convicted solely of "contact" sex offenders. Some "[m]odifications . . . have been implemented that consider the role that the [I]nternet plays in the [child pornography] offense process."[35] In particular, effective treatment of child pornography offenders typically must address problematic Internet use such as compulsion or an offender's involvement, if any, in Internet-based sexually deviant "communities" of other offenders.[36]

In order to design appropriate treatment, clinicians typically first administer a psychosexual evaluation to determine: amenability to treatment; recommended types and intensity of treatment; level of risk for sexual and non-sexual recidivism; and level of criminal justice supervision required.[37] A complete psychosexual evaluation will typically include a

---

[32] *See e.g.*, David K. Ho & Callum C. Ross, *Editorial: Cognitive Behaviour Therapy for Sex Offenders. Too Good to be True?* 22 CRIM. BEHAV. & MENTAL HEALTH 1 (2012); Kevin L. Nunes, Kelly M. Babchishin & Franca Cortoni, *Measuring Treatment Change in Sex Offenders*, 38 CRIM. JUST. & BEHAV. 157 (2011) (contending that individuals show only "modest" positive change after treatment).

[33] *See, e.g.*, CSOM, *Comprehensive Approach to Sex Offender Management, supra* note 31, at 5; Kevin L. Nunes, Kelly M. Babchishin & Franca Cortoni, *Measuring Treatment Change in Sex Offenders*, 38 CRIM. JUST. & BEHAV. 157 (2011); Leigh Harkins & Anthony R. Beech, *A Review of the Factors that Can Influence the Effectiveness of Sexual Offender Treatment: Risk, Need, Responsivity & Process Issues*, 12 AGGRESSION & VIOLENT BEHAV. 615, 618–19 (2007) (discussing different treatment goals including, *inter alia*, confronting and changing distorted attitudes about sexuality, promoting healthy social functioning, and preventing recidivism).

[34] *See* Harkins & Beech, *supra* note 33, at 616; Testimony of Dr. Jennifer A. McCarthy, Assistant Director and Coordinator, Sex Offender Treatment Program, New York Center for Neuropsychology, to the Commission, at 113 (Feb. 15, 2012) ("McCarthy Testimony").

[35] Prepared Statement of Dr. Jennifer McCarthy to the Commission, at 5–6 (Feb. 15, 2012) ("McCarthy Statement").

[36] *Id.* Implementation of treatment regimes tailored to child pornography offenders — called "i-SOTP" (short for "Internet Sex Offender Treatment Programs") — first occurred in the United Kingdom in 2006. *See* David Middleton, *From Research to Practice: The Development of the Internet Sex Offender Treatment Programme (i-SOTP)*, 5 IRISH PROBATION J.49 (2008). Results of a preliminary study concerning the effectiveness of the i-SOTP "appear[] to be sufficiently encouraging," although a long-term study of the effectiveness of the program will require more time to pass. David Middleton et al., *Does Treatment Work with Internet Sex Offenders? Emerging Findings from the Internet Sex Offender Treatment Program (I SOTP)*, 15 J. SEXUAL AGGRESSION 5, 17 (2009).

[37] CSOM, *Comprehensive Approach to Sex Offender Management: Clinical Assessments, supra* note 31, at 4–5.

clinical interview during which a thorough history is taken including the offender's sexual history (interests, behaviors, and sexual partners), the history of any physical or sexual abuse inflicted on the offender, substance abuse history, and mental health and medical history.[38]  The evaluation may include a personality assessment[39] and risk assessment.[40]

One factor of particular interest in creating a treatment plan is an offender's deviant sexual attitudes, especially attitudes toward children.  Cognitive distortions appear to play a significant part in offenders' interest in child pornography and also some offenders' proclivities to commit sexual contact offenses against children.[41]  The clinical interview thus often will include discussion of the offender's sexual interests and beliefs regarding children.  However, the evaluator often also typically will rely on non-verbal tests to determine whether an offender has pedophilic, hebephilic, or other paraphilic interests,[42] because offenders tend to minimize their behavior or deny deviant thoughts.[43]  Two common such assessments are penile phallometric tests ("PPT") (which measure physical arousal to sexual stimuli) and visual response time (VRT) tests (which measure visual response to images of persons from different genders and age groups).[44]

According to experts, "[t]here is a variety of accepted treatment and behavior management programs" for sex offenders.[45]  Sex offenders, including child pornography offenders, are most commonly treated with cognitive behavioral therapy (CBT),[46] often involving

---

[38]  McCarthy Testimony, *supra* note 34, at 109.

[39]  *Id.*

[40]  Risk assessment is discussed in Section B.3., *infra*.

[41]  *See* Martin C. Calder, *The Internet:  Potential, Problems, and Pathways to Hands-on Sexual Offending in* CHILD SEXUAL ABUSE & THE INTERNET: TACKLING THE NEW FRONTIER 2 (Martin C.. Calder ed., 2004); Ethel Quayle & Max Taylor, *Child Pornography and the Internet:  Perpetuating a Cycle of Abuse*, 23 DEVIANT BEHAV. 331 (2002).

[42]  McCarthy Testimony, *supra* note 34, at 109.

[43]  *Id.* at 150; *see also* Theresa A. Gannon, Kirsten Keown & Devon L.L. Polaschek, *Increasing Honest Responding on Cognitive Distortions in Child Molesters:  The Bogus Pipeline Revisited*, 19 SEX ABUSE 5, 5–6 (2007).

[44]  The PPT will typically expose the subject to different images and measure the change in bloodflow based on the type of image.  *See* FABIAN M. SALEH et al., SEX OFFENDERS: IDENTIFICATION, RISK ASSESSMENT, TREATMENT, AND LEGAL ISSUES 89–118 (Oxford 2009); MANAGING ADULT SEX OFFENDERS: A CONTAINMENT APPROACH 14–3 (Kim English et al., eds. 1996); Gene Abel et al., *Classification Models of Child Molesters Utilizing the Abel Assessment for Sexual Interest*, 25 *CHILD ABUSE & NEGLECT* 703 (2001).

[45]  Association for the Treatment of Sexual Abusers (ATSA), *Sex Offender Treatment for Adult Males* 1 (2008), http://atsa.com/sites/default/files/ppSOAdultMaleTx.pdf (last visited Dec. 20, 2012).

[46]  Testimony of Dr. Gene A. Abel, Medical Director, Behavioral Medicine Institute, to the Commission, at 92 (Feb. 15, 2012) ("Abel Testimony"); McCarthy Testimony, *supra* note 34, at 113; *see also* COSM, *Sex Offender Specific Treatment in the Context of Supervision, supra* note 30 (finding that "[c]ognitive-behavioral approaches appear most promising" as a mode of sex offender treatment).  A related form of treatment is referred to as "psycho-educational" therapy.  Psycho-educational techniques "focus[] on increasing offenders' empathy for the victim while also teaching them to take responsibility for their sexual offenses."  *See* U.S. Dept. of Justice, Office of Justice Programs (Bureau of Justice Assistance), *What Are Sex Offender Programs/Strategies?* https://www.bja.gov/evaluation/program-corrections/sops1.htm (last visited Dec. 20, 2012).

both individual and group therapy.[47] CBT combines elements of behavioral therapy, which focuses on external offender behaviors, with cognitive therapy, which focuses on internal thought processes.[48] The individualized CBT for child pornography offenders relies on, among other things, an offender's motivations for using child pornography, sexual interests, participation in an online community of offenders, and predilection for contact offenses or other sexually dangerous behavior. If a mental health provider were able to access and review the offender's previous child pornography collection or, at a minimum, a forensic report regarding the collection, the provider's ability to develop a more finely tailored program of treatment would be enhanced.[49] According to some clinical practitioners, CBT in conjunction with additional relapse prevention support, including polygraph testing (discussed further below), appears to be effective for most child pornography offenders.[50] In addition to CBT, treating psychiatrists also may prescribe medication (*i.e.*, serotonin-specific reuptake inhibitor drugs or, in some cases, anti-androgenic medication).[51]

Experts believe that the appropriate duration of treatment, including follow-up "maintenance" to prevent relapse, "depends on a variety of factors, including the program or practitioner's approach and the offender's characteristics, offense patterns, level of risk to recidivate, and community support."[52] Dr. Gene Abel, M.D., a psychiatric expert on sex offenders who testified before the Commission at its 2012 public hearing on child pornography offenses, recommended a period of treatment and follow-up "maintenance" ranging from five to ten years for the typical non-production offender.[53] For some offenders, he opined, life-time maintenance is required.[54]

---

[47] *See* Michael Knapp, *Treatment of Sex Offenders* 13–5, *in* MANAGING ADULT SEX OFFENDERS: A CONTAINMENT APPROACH (Kim English et al., eds., 1996) ("Group therapy provides the best format for confronting ongoing denial [by offenders], increasing an offender's acceptance of deviance, and maximizing accountability. . . . For sex offenders, individual therapy cannot begin to match the effectiveness of group therapy.").

[48] Harvey Milkman & Kenneth Wanberg, *Cognitive-Behavioral Treatment: A Review & Discussion for Corrections Professionals*, NAT'L INST. OF CORR., at xii (2007).

[49] McCarthy Testimony, *supra* note 34, at 122–24 (testifying that, "if we have information from the [forensics] report to say this guy focused primarily on images that were depicting minors under the age of 12, that's extremely valuable information with regard to treatment"). However, according to Dr. McCarthy, treatment providers today do not typically have access to information about the nature of an offender's child pornography collection (other than a general description of the specific images for which he was convicted). *See id.* at 122–24.

[50] *See, e.g.*, Abel, Testimony, *supra* note 46, at 92–93 ("How effective is that treatment? It's quite effective. Treating adults, 93 to 95 percent success if [official supervision] is involved, and if polygraphs are done every six months, and if cognitive behavioral treatment is used.").

[51] D.M. Greenberg & J.M.W. Bradford, *Treatment of the Paraphilic Disorders: A Review of the Role of the Selective Serotonin Reuptake Inhibitors*, 9 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 349 (1997); D.J. Stein et al., *Serotonergic Medications for Sexual Obsessions, Sexual Additions and Paraphilias*, 53 J. CLINICAL PSYCHIATRY 267 (1992); Barry M. Maletzky et al., *The Oregon Depo-Provera Program: A Five-Year Follow-Up*, 18 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 303 (2006); *see also* McCarthy Testimony, *supra* note 34, at 116 (testifying that occasionally "psychopharmacology may be used" in treatment but is not common "because there's a lot of side effects to this medication").

[52] ATSA, *Sex Offender Treatment for Adult Males*, *supra* note 45, at 1.

[53] *See* Abel Testimony, *supra* note 46, at 136–37 (recommending at least five to ten years of treatment, including "maintenance," for the typical child pornography offender). Dr. Abel opined that CBT usually is successfully

Polygraph testing of sex offenders is widely accepted by experts as a critically important corollary to effective treatment. In this context, polygraph testing is not intended to develop incriminating evidence, but instead is used as a "truth facilitator" for sex offenders to accomplish the goals of treatment.[55] "Like urinalysis testing with drug offenders, the polygraph examination is a tool to gauge [a sex] offender's progress and compliance with treatment and supervision expectations."[56] According to senior federal probation officers with expertise in supervising sex offenders: "Polygraph exams may be used to aid supervision and treatment, and officers may discuss the polygraph results with the treatment provider and the offender. Frequently, the offender will admit to violations [of the conditions of supervision] before the polygraph is administered."[57] Use of polygraphs in sex offender treatment has been recommended by the Association for the Treatment of Sexual Abusers.[58]

2.    *Treatment in Prison and on Supervision*

Treatment of child pornography offenders may occur while they are in federal prison and, as noted above, is a standard condition of their supervision (on probation or supervised release).

a.    Treatment While in Prison

The Federal Bureau of Prisons ("BOP") has comprehensive sex offender management strategy, including for offenders serving sentences for child pornography offenses. According to the BOP:

> With the passage of the Walsh Act [in 2006[59]], the BOP has further expanded its monitoring, evaluation, and treatment programs for sex offenders. As required by the Walsh Act, a specialized sex offender program is offered in each BOP region. Inmates with a history of sexual offenses may be designated to the Sex Offender Management Program (SOMP), at one of six institutions: FMC Devens; United States

---

implemented with "120 contacts" between an offender and treatment provider. *Id.* at 136. He further opined that "maintenance [should be] really long, and the maintenance is just as important as the treatment . . . . [W]hatever treatment you have, it doesn't count unless it's maintained over time." *Id.*

[54]  *See id.* at 137.

[55]  Jami Krueger, *The Use of the Polygraph in Sex Offender Management*, RESEARCH BULLETIN 3, at 12 (N.Y. State Div. of Probation and Correctional Alternatives), http://nicic.gov/Library/023570 (last visited Dec. 20, 2012); *see also* Kim English et al., *The Value of Polygraph Testing in Sex Offender Management: Research Report Submitted to the National Institute of Justice* (December 2000), https://www.ncjrs.gov/pdffiles1/nij/grants/199673.pdf; *see also* McCarthy Testimony, *supra* note 34, at 117–22 (Feb. 15, 2012) (testifying about the effective use of polygraphs in treatment); Abel Testimony, *supra* note 46, at 132 (opining that, while "polygraphs are not perfect," they are "exceedingly useful" in the treatment of such offenders because the typical offender in treatment tends to be dishonest about his sexual preferences and/or sexual history with children).

[56]  HEIL & ENGLISH, *supra* note 30, at 30.

[57]  Adam Graves & Mike Jones, *The Containment Model and Its Impact on Sex Offender Policy*, 36 NEWS & VIEWS [newsletter of U.S. Probation and Pretrial System] 8 (Aug. 1, 2011).

[58]  English et al., supra note 47, at 15–3.

[59]  The Adam Walsh Act is discussed at *infra* note 100 and accompanying text.

Penitentiary (USP) Marion; USP Tucson; Federal Correctional Institution (FCI) Seagoville; FCI Petersburg; and FCI Marianna.  Assignment is made in accordance with the security level of the individual.  An inmate amenable to treatment is offered participation in the Sex Offender Treatment Program (SOTP-NR) offered at all SOMP institutions.  SOTP-NR offers inmates individualized nonresidential treatment, ordinarily involving six to eight hours of programming per week, over a six month period.  All participation in non-residential treatment services is voluntary.[60]

BOP also has a "residential" treatment program for sex offenders (including child pornography offenders):

Inmates at any BOP institution may choose to volunteer for an intensive residential sex offender treatment program (SOTP-R) offered at FMC Devens.  The BOP reviews each application for the SOTP-R, considering such factors as the seriousness of the inmate's sexual offending history, the inmate's disciplinary record, and the amount of time remaining on the inmate's sentence.  The SOTP-R is a therapeutic community, housed in a 112-bed specialized unit.  The program employs a wide range of cognitive-behavioral and relapse prevention techniques to help the sex offender manage both his sexual deviance both within the institution and in preparation for release.  Ordinarily, participants complete the program in 12 to 18 months.[61]

b.    The "Containment Model":  Treatment of Offenders
        on Supervision

It is widely accepted among treatment providers that "prison treatment will be more effective if it is followed by community-based containment services, including supervision, treatment, and polygraph testing."[62]  Like many of their counterparts in the state parole and probation systems, federal probation officers currently implement what is known as the "containment model" of supervision of sex offenders, including child pornography offenders, on federal probation or supervised release.[63]  The containment model is based on the close cooperation of the supervising officer, a mental health treatment provider, and a polygraph

---

[60]  *See* BOP, *Legal Resource Guide to the Federal Bureau of Prisons* 28–29 (2008), http://www.bop.gov/news/PDFs/legal_guide.pdf. (last visited Dec. 12, 2012).

[61]  *Id.* at 29; *see also* Kathleen Horvatits, *Sex Offender Treatment Programs at the Federal Bureau of Prisons* 36 NEWS & VIEWS [newsletter of U.S. Probation and Pretrial System] 4 (Aug. 1, 2011).

[62]  HEIL & ENGLISH, *supra* note 30, at 1.

[63]  *See* Graves & Jones, *supra* note 57, at 8 ("In the supervision of sex offenders, our system has relied on [the book,] *Managing Adult Sex Offenders:  A Containment Approach* [(Kim English et al., eds., 1996)].  Since the book's release in 1996, it has steadily become respected system-wide as the blueprint for the community supervision of sex offenders.").

examiner.[64]  Kim English, one of the leading developers of the containment model, has described it in the following manner:

> The containment approach operates in the context of multi-agency collaboration, explicit policies, and consistent practices that combine case evaluation and risk assessment, sex offender treatment, and intense community surveillance, all designed specifically to maximize public safety. . . .  There are three anchors in containment-focused risk management:  (1) supervision, (2) therapy, and (3) polygraph examinations.  Each benefits from the distinct function of the others.  The criminal justice supervision activity is informed and improved by the information obtained in sex-offender-specific therapy, and therapy is informed and improved by the information obtained during well-conducted post-conviction polygraph examinations.  Each anchor must be perceived by the offender as separate yet aligned with the other.[65]

According to the Center for Sex Offender Management, "[a]gencies that have moved to a Containment Approach are hopeful that the combination of these three resources will prove significantly effective in reducing re-offense rates."[66]  The CSOM also has noted "promising results" of a recent study of the efficacy of sex offender treatment in the specific context of the containment model.[67]  It is widely accepted that the containment model has become a "best practice" to be implemented in supervising sex offenders in both the federal system and many state systems.[68]

---

[64]  *Id.*; *see also* MANAGING ADULT SEX OFFENDERS:  A CONTAINMENT APPROACH, *supra* note 47, at 2–5–2–6, 2–10–2–12 (discussing the "containment approach," which "seeks to hold sex offenders accountable through the combined use of both the offenders' internal controls and external controls through criminal justice control measures, and the use of the polygraph to monitor internal controls and compliance with external controls").

[65]  Kim English, *The Containment Approach to Managing Sex Offenders*, 34 SETON HALL L. REV. 1255, 1257, 1262 (2004).

[66]  CSOM, *Sex Offender Treatment in the Context of Supervision: Effectiveness of Sex Offender Treatment, supra* note 30.

[67]  *Id.*; *see also* SEXUAL DEVIANCE: THEORY, ASSESSMENT, AND TREATMENT 542 (Laws & O'Donohue eds., 2d ed. 2008) (likewise noting "promising results" from studies of the effectiveness of psycho-sexual treatment in the specific context of the containment model).

[68]  *See* Graves & Jones, *supra* note 57, at 8 (noting that, since the mid-1990s, the containment model "has steadily become respected system-wide as the blueprint for the community supervision of sex offenders"); Roger Pimentel & Jon Muller, *The Containment Approach to Managing Defendants Charged With Sex Offenses*, 74 FED. PROB. 24, 24 (2010) ("The containment approach . . . is an accepted, effective way to manage sexual offenders, based on empirical data and theoretical concepts consistent with the best available information from the field of community corrections."); *see also* Kevin Walkow, *Chapter 219:  Chelsea's Law*, 42 MCGEORGE L. REV. 656, 671 (2011) ("The Containment Model is considered the best practice in sex offender management."). Similarly, a representative of the federal defender community, who testified before the Commission in February 2012, opined that child pornography offenders "can be treated through this containment model."  Testimony of Deirdre von Dornum, Assistant Federal Defender, Federal Defenders of New York, to the Commission, at 388 (on behalf of federal and community defenders) (Feb. 15, 2012).

Although child pornography offenders make up a small percentage of offenders under federal supervision,[69] their supervision requires "extraordinary" resources,[70] and "[p]robably no other offender population offers management challenges in the way that sex offenders do."[71] Success in implementing the containment model thus depends on adequate resources and proper training of the professionals who implement it.[72]

### 3.    *Risk Assessments of Child Pornography Offenders*

A threshold issue in approaching individualized treatment and supervision of a sex offender is assessing a particular offender's risk for sexual recidivism. Because a significant percentage of child pornography offenders either have a history of criminal sexually dangerous behavior[73] and/or are pedophiles,[74] the need to assess their risk of engaging in sexually dangerous behavior is critical. Mental health experts who treat sex offenders generally agree that an actuarial risk assessment of a sex offender, particularly when used in conjunction with a treatment provider's clinical assessment, is a better means of predicting sexual recidivism than a provider's clinical judgment alone.[75] An actuarial risk assessment, which uses a validated "instrument" such as the Static-99,[76] "is based on the presence or absence of a limited number of pre-specified factors" associated with recidivism.[77] However, there is some debate about the

---

[69] As discussed in Chapters 6 and 9, in fiscal year 2010, non-production child pornography offenders were 2.0% of federal offenders sentenced and production offenders were .025% of all federal offenders sentenced. *See* Chapter 6 at 126 Chapter 9 at 247.

[70] Michelle Spidell & Trent Cornish, *Introduction to the Special Issue on Supervision of Sex Offenders and Location Monitoring in the Federal Probation and Pretrial Services System*, 74 FED. PROB. 2, 2 (Sept. 2010).

[71] CTR. FOR SEX OFFENDER MGMT. (CSOM), ENHANCING THE MANAGEMENT OF ADULT AND JUVENILE SEX OFFENDERS: A HANDBOOK FOR POLICYMAKERS AND PRACTITIONERS 56 (2007) ("CSOM HANDBOOK").

[72] *See id.* at 9–13.

[73] *See* Chapter 7 at 181 (approximately one-third of all federal non-production offenders in fiscal year 2010 had histories of criminal sexually dangerous behavior).

[74] *See* Chapter 4 at 75 (noting that some experts believe that a majority of child pornography offenders are pedophiles).

[75] *See, e.g.*, Dennis Doren, *Recidivism Risk Assessments: Making Sense of Controversies, in* SEXUAL OFFENDER TREATMENT 3 (W. Marshall et al., eds. 2006). Several different risk assessments instruments are used by treatment providers. *See* R. Karl Hanson, *Risk Assessment, ATSA Information Package* (Association for Treatment of Sexual Abusers), 2–4 (2000), http://www.atsa.com/sites/default/files/InfoPack-Risk.pdf (last visited Dec. 20, 2012) (discussing the different instruments); Eric S. Janus & Robert A. Prentky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility, and Accountability*, 40 AMER. CRIM. L. REV. 1443 (2003) (same).

[76] *See* Static99 Clearinghouse "Overview," http://www.static99.org (last visited Dec. 20, 2012) (describing the Static-99 risk assessment instrument).

[77] Douglas Mossman et al., *Risky Business Versus Overt Acts: What Relevance Do "Actuarial," Probabilistic Risk Assessments Have For Judicial Decisions on Involuntary Psychiatric Hospitalization*, 11 HOU. J. HEALTH & L. POL'Y 365 (2012) ("Over the past two decades, for example, several teams of psychologists have developed 'actuarial risk assessment instruments' . . . to aid in quantifying the level of risk — that is, the probability — that an evaluee will engage in certain kinds of [illegal] behavior during specified future periods of time. These instruments get the name 'actuarial' because they implement a judgment process similar to methods used by insurance companies to assess probabilities of certain events (*e.g.*, deaths) and to make decisions about premiums (*e.g.*, for life insurance). In both cases, an actuarial judgment of risk is based on the presence or absence of a limited number of

predictive value of such assessments for different subgroups of sex offenders, in particular those who have no known history of committing sexual "contact" offenses.[78] A child pornography offender's risk of committing contact sex offenses generally can be assessed using a validated risk assessment instrument where the offender has a history of committing one or more contact sex offenses.[79] Social science research on risk assessments applicable to child pornography offenders with no known history of CSDB "is just beginning to emerge."[80] Currently, there is no validated risk assessment instrument applicable to such offenders — with respect to both future CSDB (in particular, sexual contact offenses) and subsequent non-production child pornography offending.[81]

Emerging research has focused on the "two major dimensions of risk" — sexual deviance and antisociality[82] — for sex offenders generally and child pornography offenders specifically. Such research, which is nascent, has suggested certain specific factors that, particularly in combination, may be relevant to predicting sexual recidivism by child pornography offenders.[83] Because existing research on the predictive value of these factors, whether alone or in

---

pre-specified factors with known, empirically established relationships to an outcome. Although the scope and implementation styles [of such assessments] vary, they generally direct mental health professionals to gather information about a specific set of 'risk factors' . . . The evaluator then assigns numerical values to these factors according to some preset formula to produce an estimate of risk — a numerical probability . . . .").

[78] *See* Loretta J. Stalans, Robyn Hacker & Mary E. Talbot, *Comparing Nonviolent, Other-Violent & Domestic Batterer Sex Offenders: Predictive Accuracy of Risk Assessments on Sexual* Recidivism, 37 CRIM. JUST. & BEHAV. 613, 613 (2010); Martin Rettenberger et al., *Prospective Actuarial Risk Assessment: A Comparison of Five Risk Assessment Instruments in Different Sexual Offender Subtypes*, 54 INT'L J. OF OFFENDER THERAPY & COMP. CRIMINOLOGY 169, 170 (2010).

[79] *See* Angela W. Eke & Michael C. Seto, *Risk Assessment of Child Pornography Offenders*, at 163, INTERNET CHILD PORNOGRAPHY: UNDERSTANDING AND PREVENTING ON-LINE CHILD ABUSE (K. Ribisl & E. Quayle eds., 2012) ("Well-validated risk measures are already available for child pornography suspects who have a known history of contact sexual offending."); Kelly M. Babchishin et al., *The Characteristics of Online Sex Offenders: A Meta-Analysis*, 23 SEXUAL ABUSE 92, 94 (2011) ("For online offenders who already have a known contact sex offense [history], current risk assessment . . . would be applicable."); *but cf.* United States v. C.R., 792 F. Supp. 2d 343, 459–60 (E.D.N.Y. 2011) (crediting an expert witness who testified that STATIC-99, a risk assessment instrument for offenders who committed "contact" sex offenses, was not appropriately used on an offender who was convicted of a child pornography offense but whose only known "contact" sex offense was proved by a "self-report" by the offender rather than by a prior conviction).

[80] Eke & Seto, *supra* note 79, at 155; *see also* Jody Osborn et al., *The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. OF AGGRESSION, CONFLICT, & PEACE RES. 16 (2010).

[81] Eke & Seto, *supra* note 79, at 155; *see also* Abel Testimony, *supra* note 46, at 107 (testifying that risk assessment instruments for child pornography offenders with no contact offense history currently do not exist but may be developed in the future).

[82] Eke & Seto, *supra* note 79, at 153.

[83] *Id.* at 156, 160 (noting several such factors: (1) an offender's general criminal history and, in particular, prior commission of a violent or sexual offense; (2) an offender's prior failure on judicial supervision; (3) an offender's youthful age at the time of his first arrest (for any offense); (4) an offender's history of substance abuse; (5) an offender's low education level; (6) an offender's admitted sexual interest in children; (7) an offender's possession of child pornography depicting prepubescent children; and (8) the prevalence of male victims portrayed in the child pornography possessed by the offender).

combination, is extremely limited, caution should be exercised in using such specific factors to predict CSDB (including the commission of new child pornography offenses), particularly when such factors are considered in isolation.  For instance, the Commission's special coding project of fiscal year 2010 non-production cases found that offenders with a history of criminal sexually dangerous behavior and offenders with no such history had virtually identical prevalence rates of substance abuse, even though this is one of the factors cited as relevant to predicting sexual recidivism.[84]

Some researchers have concluded that the single most significant factor associated with criminal sexually dangerous behavior committed by child pornography offenders (in particular, their commission of sexual contact offenses) is their degree of antisociality, as measured on an antisocial behavior scale.[85]  This recent research concerning child pornography offenders is consistent with earlier research that concluded that antisociality, when coupled with sexual deviance, is a strong predictor of sexual recidivism among sex offenders generally.[86]  Because antisociality is typically manifested during an offender's childhood[87] and further because the typical PSR does not contain extensive information about criminal and other antisocial acts committed by offenders before the age of majority,[88] the Commission's special coding project of child pornography cases was unable to specifically examine antisociality among offenders.

### C.    SEX OFFENDER REGISTRATION AND CIVIL COMMITMENT ISSUES FACING CHILD PORNOGRAPHY OFFENDERS

All offenders convicted of a federal child pornography offense are now subject to sex offender registration laws.  In addition, a small percentage of federal child pornography offenders may face civil commitment after serving their prison sentences.  This section discusses those two post-conviction issues.

---

[84] *See* Chapter 7 at 197 n.93.

[85]  *See* Austin F. Lee et al., *Predicting Hands-On Child Sexual Offenses Among Possessors of Internet Child Pornography*, 18 PSYCH., PUB. POL'Y, AND L. 644 (2012).  In their study, the researchers asked offenders various questions related to antisocial behavior, such as an offender's history of committing violent offenses, childhood bullying behavior, and misconduct resulting in expulsion from school. *See id.*  Assessing antisociality often requires knowledge about an offender's youth (in particular, whether he engaged in antisocial acts before the age of 15 years old). *See* AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISIONS (DSM-IV-TR) 645–650 (4th ed. 2000) (requiring, for a diagnosis of antisocial personality disorder, that "[t]here is evidence of [antisociality] before [the] age [of] 15 years").

[86]  *See* R.K. Hanson & K. Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders:  A Meta-Analysis of Recidivism Studies*, 73 J. OF CONSULTING AND CLINICAL PSYCHOL. 1154 (2005) (meta-analysis of 82 different studies involving 29,540 sex offenders from several different countries, including the U.S.; primary findings were that deviant sexual interests and antisocial orientation were primary predictors of sexual recidivism).

[87]  *See* DSM-IV-TR, *supra* note 85, at 645–50.

[88]  *Cf.* USSG §4A1.2(d) (limiting consideration of offenses committed prior to age 18 for purposes of determining an offender's criminal history category).

# EXHIBIT "F"

**MEMORANDUM**
**TO THE HONORABLE JACK B. WEINSTEIN**
**Senior United States District Judge**

Reference is made to Your Honor's recent inquiry regarding information on the treatment and supervision of offenders convicted of Possession of Child Pornography under supervision in the Eastern District of New York (EDNY). By way of background, the sex offender specific caseload was created in the Eastern District of New York, within the Supervision Division in November 1998, due to the increase of sex offender registration laws and offenders convicted of sexual offenses entering the federal criminal justice system. Prior to the establishment of the sex offender caseload, sex offenders were assigned to a mental health caseload, where the officer supervised offenders with a myriad of mental health disorders. The department created a second sex offender specific caseload in 2001, to address the supervision of sexual offenders on Long Island. Finally, in 2003, the department created the Sex Offender Unit, which currently consists of a Supervisory U.S. Probation Officer, a Senior U.S. Probation Officer, two U.S. Probation Officers (one based in our Brooklyn office and the other working out of the Central Islip Courthouse), and the department's CyberCrime Specialist. The unit is responsible for supervising all registered sexual offenders convicted of a federal and/or military sex offense, as well as those federal offenders who have been convicted of a previous sex offense on the local level and lastly those offenders who have a history or pattern of sexually deviant behavior. It is noted that over the years, our department has utilized the Containment Approach Model to supervise and treat convicted sex offenders. This model, endorsed by the Administrative Office of the Courts, American Probation and Parole Association, and Alliance for the Treatment of Sexual Abusers (ATSA), requires a collaborative approach wherein information is shared amongst supervising officer, treatment provider and polygraph examiner in an effort to establish the most effective treatment and supervision plan.

The Sex Offender Unit is currently supervising 70 sexual offenders, 55 of which are registered sex offenders in New York State. Of these 70 offenders, 36 were convicted of a child pornography offense[1] (this includes possession, receipt, and/or transmission of child pornography images). Out of the 36 child pornography offense convicted currently under supervision, 9 have admitted to prior sexual contact of a minor[2] through the use of clinical polygraph and/or self report (during the term of supervision). We note that 4 out of the 36 child pornography offenders currently on supervision have yet to undergo a sexual history polygraph due to their early stages of treatment, hence the extent of their abuse remains unknown.

---

[1] For the purposes of this memorandum, the probation department has included only those offenders convicted of a child pornography offense. We note that there are those occasions where child pornography is traded or found in connection with an investigation, although the offender was not convicted of a child pornography offense. Those cases were not included in this data.

[2] The probation department utilizes the New York State Penal Law definition of sexual contact. "Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing.

The following statistics were obtained from the 36 child pornography offenders we are currently supervising: 5 offenders are between the ages of 60-69 (2 have reported sexual contact with a minor prior to the term of supervision); 8 offenders are between the ages of 50-59 (2 have reported sexual contact with a minor prior to the term of supervision); 9 offenders are between the ages of 40-49 (3 have reported sexual contact with a minor prior to the term of supervision); 9 offenders are between the ages 30-39 (1 has reported sexual contact with a minor prior to the term of supervision); and 5 offenders are between the ages of 20-29 (1 has reported sexual contact with a minor prior to the term of supervision).

The probation department is currently supervising 3 offenders convicted of a child pornography



offense who are under the age of 26. We currently have no females under sex offender specific supervision. It is interesting to note that to date, the department has only knowingly supervised 1 female who was convicted of a sex offense (she was convicted of Possession of Child Pornography and successfully completed her term of release). The remaining 34 sex offenders currently under our supervision have been convicted of a variety of sex offenses including, but not limited to: Coercion and Enticement; Rape; Sexual Abuse of a Minor; Sexual Abuse of a Ward; Traveling Interstate to Engage in Sexual Activity with a Minor; Promoting Prostitution; and Failure to Register as a Sex Offender.

Since 1999, the unit has supervised approximately 280 registered and non-registered sex offenders,



Case 1:09-cr-00155-JBW    Document 140-3    Filed 05/16/11    Page 3 of 7 PageID #: 1851

108 of which were convicted of a child pornography offense as previously defined. Approximately 20% of the 108 child pornography offenders supervised by this office disclosed a prior victim (sexual contact with a minor that occurred before the term of supervision which was never reported to law enforcement or another treatment agency) either via clinical polygraph examination or self report during the term of supervision. It is the policy of the probation department and treatment provider to advise offenders that any such disclosure will not be used against them for the pursuit of new criminal charges, so long as they do not provide identifying information. As such, they are encouraged to <u>only</u> report the age, gender, and details of the sexual contact in an effort to gain the offender's trust and provide the basis for continued honesty in treatment. Much to the credit of our supervising officers and treatment providers, we have had only 1 known offender convicted of child pornography offense who committed a new sexual contact offense while under the supervision of this department, which we are aware of. This offender admitted to current sexual contact of a 9 year old female family member during a polygraph examination. The information was subsequently confirmed through investigation by our department and the Suffolk County Police Department. The offender, who was 36 years of age at the time of the new criminal conduct, was prosecuted by local authorities and had his supervision revoked in this district. He is currently serving his second term of supervised release with our district.

Although only 1 known offender convicted of a child pornography offense under our supervision



has committed a new sexual contact offense with a minor, it is imperative to point out that this population has its share of non-compliance. This is evident by the fact that out of the 108 offenders convicted of a child pornography offense, approximately 244 instances of non-compliance or requests for modifications were reported to the Court since 1999. This number is consistent with the probation department's belief in graduated sanctions and the fact that successful sex offender supervision relies heavily on responding to all levels of non-compliance.

Furthermore, of the 108 offenders under our supervision convicted of a child pornography offense since 1999, 14 had their supervision revoked (12.9%) and 3 of the offenders had multiple terms of supervision revoked.



### 1999-2010 Supervision revocations of offenders with child pornography offenses

Convicted child pornography offenders with revoked supervision, 12.96%

Convicted child pornography offenders with successful completion or currently active, 87.04%

**\*for these 108 offenders, approximately 244 instances of non-compliance or requests for modifications were reported to the Court since 1999.**

As mentioned above, since the inception of the sex offender specific caseload, the probation department has utilized the Containment Approach in an effort to minimize risk to the community, while providing treatment to the offender. "This approach rests on the dual premise that sex offenders are one hundred percent responsible for the damage they inflict on others and that they must constantly and consistently be held accountable for their inappropriate thoughts, feeling, and illegal actions." (English, Pullen, Jones, & Krauth, 1996). The three central components of the Containment Approach are as follows: 1) Internal Control - control over inappropriate sexual impulses, feelings, and behaviors through offense specific treatment and a variety of psycho-educational and behavior modification techniques; 2) External Control - provided by the criminal justice system through the use or threatened use of sanctions to ensure compliance with the conditions of supervision; 3) Clinical Polygraph Examinations - used as a monitoring tool to combat the offender's reluctance to disclose the information necessary for effective monitoring. The goal of the polygraph exam is not for the offender to fail, but rather pass, meaning proper disclosure was made. (English, Pullen, Jones, & Krauth, 1996) This in turn will increase the likelihood that the appropriate treatment and supervision plan will be developed and implemented. Offenders enrolled in sex offender specific treatment through our department are required to undergo a sexual history polygraph examination no later then 4 months after the commencement of treatment. This examination is followed by maintenance examinations to ensure honesty in treatment and compliance with the conditions of supervision. These examinations are usually given to an offender every 6 months during the term of supervision.

Officers are selected for the unit on a competitive basis. Emphasis is placed on field work, desire and emotional ability to work with this unique population and familiarization with the Containment Approach. The unit receives extensive on the job training conducted by the supervisor and senior officer. Additionally, officers routinely attend training in the field of sex offender treatment and supervision. Over the years officers have attended national training with the Alliance for the Treatment of Sexual Abusers (ATSA), the New York State Alliance for the Treatment of Sexual Abusers (NYATSA), Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office, as well training with the Administration for Child Services (ACS), Coalition Against Child Abuse and Neglect (CCAN), and the Federal Bureau of Investigation (FBI). Officers are current members of the EDNY Sex Offender Task Force, which provides a forum for inter-agency collaboration. Finally, several officers have been recognized both internally and externally for their work with sex offenders. Specifically, 3 officers have been honored with the distinguished "Champion for Children" award presented by the Parents for

Case 5:15-cr-00342-BKS   Document 62   Filed 06/23/16   Page 62 of 68
Case 1:09-cr-00155-JBW   Document 140-3   Filed 05/16/11   Page 5 of 7 PageID #: 1853
Megan's Law

In 2009, the probation department solicited vendors for sex offender treatment through the Metro Newspaper and Fedbiz-ops. The only response to New York City solicitation came from New York Forensic. On Long Island, the probation department received responses from both New York Forensic (Great Neck office) and First Light Psychological Services (Farmingdale). As such, contracts were awarded to New York Forensic (both Brooklyn and Long Island) and First Light Psychological Services (Farmingdale).

New York Forensic has been working with the probation department and our sex offender population for the last ten years and currently treats the bulk of our sexual offenders. New York Forensic offers a wide variety of mental health services. Therapists are well equipped to treat mental health issues such as depression and anxiety, while also addressing an offender's deviant sexual behavior. Individual sessions can be increased or dedicated solely to addressing an underlying mental health issue or illness before delving into the criminal sexual behavior. Psychopharmacologic treatment is also available and can be instituted as part of an individual's treatment program.

New York Forensic is currently treating 42 sex offenders under the supervision of the EDNY. It is noted that New York Forensic also treats sexual offenders referred from the Southern District of New York, in addition to local community correctional agencies, such as the New York City Probation Department. Of our 42 offenders, 34 were convicted of a child pornography offense. These offenders are required to attend both weekly group and individual treatment sessions. Currently, there are 5 sex offender specific groups being run by New York Forensic on a weekly basis. According to New York Forensic, their Sex Offender Treatment Program includes individual therapy and psycho-educational groups which stress personal responsibility and focus on increasing self-awareness, developing self-control, facilitating victim empathy and relapse prevention. Consistent with the "containment approach model," New York Forensic believes that it is essential that the treating clinician, referring party, probation officer and the Court remain in regular contact in order to promote optimal client attendance and compliance with treatment. Clinical polygraph is used on an intermittent basis throughout the course of treatment to assist the patient and clinician in formulating and instituting a treatment plan that reflects the reality of each patient's pattern of offending behavior.

Program coordinator, Jennifer McCarthy, Ph.D., advises that there are currently 5 staff members assigned to sex offender specific therapy (2 males therapists and 3 female therapists). 4 out of 5 of these therapists currently have their Ph.D. in Psychology, while the 5th member is in the process of obtaining same. Therapists consistently meet with the program coordinator to discuss specific cases. Both the probation department and program coordinator encourage therapists to attend training and continue their development in the field of sex offender treatment. According to Dr. McCarthy, there is currently no treatment regiment dedicated specifically to the child pornography offender. Thus, this particular type of offender participates in sex offender specific treatment, with emphasis placed on the details of the instant offense and the offender's sexual experiences and background. As such, treatment is individualized to meet the cognitive and emotional needs of the offender. Risk factors are discussed in treatment and relayed to the supervising officer and polygraph examiner in an effort to modify behavior and identify triggers. All offenders entering the program are assessed to ensure they possess the cognitive skills and maturity to participate in a sex offender group.

Dr. McCarthy states that several studies were presented at this year's national ATSA conference on the topic of child pornography offenders and recidivism rates. One such study due to be published by the end of the year, suggest "anywhere between 0% and 50% of child pornography offenders report a history of having sexual contact with minors. Despite this, however, we cannot assume that these offenders will engage in sexual contact with minors in the future as the research in this

after informs that child pornography offenders, as a group, are low risk to recidivate with a contact offense." (Eke, Seto, & Williams, in press)  She further advises that some variables have been found to be predictive of contact sexual recidivism.  These include age at first offense (i.e the younger the offender, the higher risk), criminal history, failure of conditional release, lower education, being single, using non-internet child pornography, involvement with minors on-line, and indiscriminate sexual behavior involving adults (possibly indicative of intimacy deficits).

In closing, the probation department believes that successful supervision of a sex offender requires constant interaction between officer, therapist, and polygraph examiner.  It is this collaboration coupled with an offender's willingness to be honest in treatment that leads to rehabilitation and a successful term of supervision.  Over the years we have been able to effectively implement this belief.  The current issue plaguing sex offender treatment and supervision is the lack of "intensive" or "inpatient" therapy available to offenders with significant or recurring sexually deviant thoughts and behaviors.  The probation department continues to try and find programs available to assist this small population, but currently are only aware of the Bureau of Prisons residential sex offender treatment programs.

If Your Honor has any further questions, I am available to discuss sex offender supervision at anytime.


                    RESPECTFULLY SUBMITTED:

                    EILEEN KELLY
                    CHIEF U.S. PROBATION OFFICER




PREPARED BY:    _____

                    Lawrence M. Andres, Jr.
                    Supervisory U.S. Probation Officer
                    718-804-2766


cc: The Honorable Raymond J. Dearie, Chief U.S. District Judge
     Eileen Kelly, Chief U.S. Probation Officer




                         REFERENCES

English, R., Pullen, S., Jones, L., and Krauth, B. (1996). A Model Process: A Containment Approach. In K. English, S. Pullen and L. Jones (Eds.), Managing Adult Sex Offenders (pp. 2-10, 2-11). Lexington, KY: American Probation and Parole Association.

Eke, A., Seto, M., Williams, J., (in press). Assessing the Risk Posed by Child Pornography Offenders.

# EXHIBIT "G"



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:       CPD/PSB
NUMBER:  5324.10
DATE:     February 15, 2013

# Sex Offender Programs

/s/
*Approved*: Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To establish procedures and guidelines for Sex Offender Treatment and Management Services in the Bureau of Prisons (Bureau). This Program Statement is a plain-language, comprehensive set of operational guidelines for sex offender programs operated by psychologists, treatment specialists, and other Bureau staff.

a. **Program Objectives.** The expected results of this Program Statement are to establish:

- Treatment programs that provide sexual offenders in Bureau institutions the opportunity to change behaviors, thereby reducing criminality and recidivism.
- Specialized correctional management practices to address behavior that indicates increased risk for sexual offenses upon release.
- Evaluation services to appraise risk of sexual offenses upon release and provide recommendations for effective reintegration into the community.
- Transition services for sexual offenders releasing to the community.

SENTRY definitions and assignments are on the Psychology Treatment Programs section of the Psychology Services website on Sallyport. Treatment forms discussed in this policy are also located on Sallyport (Policy/Forms on the toolbar).

b. **Definitions**

- **Sexual offender.** Any inmate with a current or prior sexual offense conviction, or a conviction for an offense that involved a sexual element (e.g., convicted of Robbery with offense conduct that includes the rape of the victim). For the purposes of this Program Statement, criminal violations involving sexual conduct with a consenting adult (e.g., prostitution, pimping) are not sexual offenses.

Supplemental treatment protocols may be used in addition to the Bureau's treatment materials. These program adjuncts must be compatible with CBT, and support the overall goals of the treatment program. Any supplemental treatment protocols must be approved by the Behavioral Management Programs Coordinator, Psychology Services Branch, in consultation with the Regional Psychology Services Administrator or the Regional Psychology Treatment Programs Coordinator.

3.3   **Program Operations.** Residential and Non-Residential sex offender treatment programs (SOTP-R and SOTP-NR) share the following operational procedures.

3.3.1   **Screening and Referral Procedures.**

a. **Program Referrals From Non-SOMP Institutions.** Psychology Services at all Bureau institutions will ensure that inmates with a history of sexual offenses receive information about sex offender treatment programs.

Inmates may self-refer for sex offender treatment services by submitting an Inmate Request to Staff (BP-A0148) to the Chief Psychologist at the inmate's current institution. Participants may enroll in the sex offender treatment program at any time during the course of their sentence, provided they have sufficient time to complete the program.

To ensure that the maximum number of inmates have the opportunity to benefit from sex offender treatment programs, inmates are prioritized for placement based on their Projected Release Date (PRD).

b. **Eligibility Criteria.** Inmates who express a willingness to participate are screened by a psychologist at the inmate's current institution to determine their eligibility for the program. An inmate must meet the following eligibility criteria to be admitted into a sex offender treatment program:

- The inmate must meet to the definition of a sexual offender, as defined in this Program Statement.
- The inmate must have sufficient time remaining on his/her sentence to complete the program, including time to transfer to the SOMP institution and receive placement in community programs, if eligible. In cases where the inmate's release date is based on a parole date, the presumptive parole date will be used to determine his/her eligibility.

  ➢ To complete the SOTP-NR, the inmate must ordinarily have no less than 21 months to his/her projected release date.
  ➢ To complete the SOTP-R, the inmate must ordinarily have no less than 27 months to his/her projected release date.

- Ordinarily, the inmate should have no 100- or 200-level incident reports in the last year. Inmates with three or more 300- and 400-level incident reports may also be precluded from placement in treatment.

> ➢ Pretreatment programming to build motivation and enhance readiness for the SOTP-R or SOTP-NR.
> ➢ Psychoeducational or psychotherapy groups that provide skills used in the SOTP-NR or SOTP-R (e.g., communication skills training; basic cognitive skills).
> ➢ Psychoeducational or psychotherapy groups that address other important treatment needs (e.g., anger management; criminal thinking; drug abuse treatment).

The specific content of adjunctive services, and duration of an inmate's participation in these services, will be based on the clinician's discretion and availability of resources.   Adjunctive programming provided by SOMP staff will be documented on PDS, as directed by the Program Statements **Psychology Services Manual** and **Psychology Treatment Programs**.  Inmates who complete pretreatment services should not receive SOTP-NR or SOTP-R program completion assignments on SENTRY.

### 3.5  Residential Sex Offender Treatment Programs

3.5.1  **Purpose**.  The Residential Sex Offender Treatment Program (SOTP-R) is a high-intensity program designed for high-risk sexual offenders.

3.5.2  **Staffing**. The SOTP-R is staffed by a psychologist who serves as the Sex Offender Management SOMP Coordinator and a team of SOMP Psychologists and SOMP Treatment Specialists.  A ratio of no more than 14 inmates per treatment staff member will be maintained. Staff performing duties in the SOTP-R will not be assigned a SOTP-NR caseload.

3.5.3  **Duration**.  Ordinarily, SOTP-R entails 10 to 12 hours of programming per week over 12 to 18 months, totaling no less than 400 hours.

3.5.4  **Target Population**.  As a high-intensity treatment program, residential sex offender treatment is targeted to:

- Inmates who have a high-risk classification for reoffense based on an actuarial risk assessment, using the Static-99R or another risk instrument standardized for use with sexual offenders.
- Inmates who are judged by SOMP staff or designated staff at the DSCC to be more appropriate for a high-intensity program based on the extent of their sex offense history, criminal history, or other factors associated with increased risk.
- Inmates who are participating in the moderate-intensity SOTP-NR, but whose risk assessment is adjusted upward by treatment staff due to factors that became apparent while in treatment (e.g., disclosure of previously undocumented sexual offenses).

3.5.5  **Residential Treatment Unit**.  The SOTP-R Unit is to be separated from the general population.  Living together in a unit allows all inmates to work together to create a community that supports pro-social attitudes and behaviors.